**PORTER et al. v. COOKE et al.**

**COOKE et al. v. PORTER et al.**
No. 9831.

Circuit Court of Appeals, Fifth Circuit.
May 1, 1942.

Rehearing Denied June 5, 1942.

Geo. O. Durham, of St. Louis, Mo., and Edward S. Klein, of Shreveport, La., for appellant Fred Porter and others.

R. A. Fraser, of Many, La., and A. B. Freyer, of Shreveport, La., for appellee R. L. Gay.

Sidney M. Cook and C. D. Egan, both of Shreveport, La., for appellee Barclay Cooke and another.

Cecil Morgan, of Baton Rouge, La., and Clarence L. Yancey, of Shreveport, La., and T. M. Milling, of Baton Rouge, La., for appellee Standard Oil Co., of Louisiana.

Before HUTCHESON, HOLMES, and McCORD, Circuit Judges.

HUTCHESON, Circuit Judge.

On the pleadings the suit was a class suit to hold the defendants as members with plaintiffs[1] of a partnership enterprise, to charge the defendants with fraud upon, and breach of trust as to plaintiffs, and to lay claim to, and obtain the fruits of, properties of the partnership enterprise which it was charged the defendants had gotten hold of and were misappropriating to their own use.

The prayer was for the appointment of a receiver, an adjudication that the properties described be declared to be properties of the partnership, that there be an accounting, and that plaintiffs' interest in the property and rights against the defendants be established and vindicated. As against defendant Cooke, alleged to be a citizen of New Jersey, there was a prayer and order for service on him under Section 57, Judicial Code.[2] The district judge finding that the suit, under the laws of Louisiana, was not one asserting an interest in property, that the petition did not allege facts to show the existence of a partnership for the purposes claimed under der Louisiana law, and that no cause of action was shown against any of the defendants except perhaps Gay, a resident of Louisiana, dismissed the bill.[3] On appeal this court held[4] that without regard to whether a partnership relation did or did not exist between plaintiffs and the defendants, the pleadings showed that plaintiffs had furnished money to the defendants for an investment in property in the benefits of the ownership of which plaintiffs were to share, and monies so furnished having been used by the defendants in acquiring the properties, referred to in the petition, a trust resulted in favor of the plaintiffs and we reversed and remanded the cause for trial on the issues thus tendered.

Thereafter Emlet defaulting and defendants, Cooke and Gay, answering and fully denying plaintiffs' charges of fraud and imposition, and their allegations that they and these defendants were partners or joint enterprisers, and their claims to interests in the property sued for, and particularly in what is known as the Loring leases on which the profitable production was obtained, there followed an interlocutory hearing with Emlet, plaintiff's chief witness, and Cooke and Gay as witnesses for themselves, interlocutory findings,[5] and an interlocutory decree.[6]

---

[1] The plaintiffs were eleven in number, out of a purported 700 investors. Each of the plaintiffs set out the contributions he had made in small amounts beginning in 1923 and 1924. Some had continued into 1928, others into 1927, some had stopped in 1925 and 1926. It was alleged that they and the other 700 persons, for whom they sued, were small investors with little business experience, and that together the 700 had contributed a total of $150,000 in cash; that during the same period the defendant Cooke had contributed $300,000, Gay had contributed nothing and that Emlet claimed to have invested large sums in the enterprise, but the facts about them were unknown to plaintiffs. The gist of their claim was that the defendants had agreed with claimants that upon the discovery of oil in paying quantities, plaintiffs would first get their money back with 100% profit, ½ of the profits would then be divided pro rata among all of the investors including Gay and Emlet, and the remaining ½ of the profits should go to Cooke.

[2] 28 U.S.C.A. § 118.

[3] Porter v. Cooke, D.C., 58 F.2d 1033.

[4] 5 Cir., 63 F.2d 637.

[5] In effect these were that Emlet had been, since about 1923, in the business of promoting one operation or undertaking, for oil and gas, after another, by procuring monies from and selling interests to plaintiffs and other small investors forming a rather fixed group of about five or six hundred persons, but each contributing independently of the others, under various forms of contract and by 1928, he had gotten from this group and expended something over $100,000. His practice was when one undertaking had failed, to re-solicit and carry forward the same investors into the new project with the hope that they could recoup in it what they had lost in the others. As a result of this practice he stood in a relation of trust to these investors and was accountable to them as such, for the handling of and the profits derived from the leases the enterprise from time to time held. During this same period, he was getting money in large amounts from Cooke, aggregating, up to 1928, when

Thereafter Cooke, pleading to the issues set for hearing before the Master, alleged that if his taking the contract of February 9, 1928, had made him trustee, his obligations as such were limited and restricted to the precise properties acquired under

they finally came to a disagreement, $300,000. At first, though Cooke was no part of his regular group but recognized by Emlet and them, as outside of it, these sums were advanced on notes and investment contracts of various types, similar to those issued to plaintiffs' group, but in the later portion of their dealings Emlet to induce Cooke to continue putting up the large sums he had advanced, began assigning specific leases or acreage to Cooke and on February 9, 1928, he held indefinite numbers of notes and investment contracts of various types, stock in Emlet's Company and leases to specific properties. On that date, Cooke, having lost confidence in Emlet and become convinced that he had squandered a considerable portion of the funds, instead of using them in the prosecution of the operations, threatened Emlet with prosecution, and as a result of this dispute, Emlet made the settlement and executed the assignment out of which this law suit springs. As a result of this February, 1928 agreement, Emlet assigned to Cooke all the oil and gas leases standing in his name in Sabine Parish, except 4000 acres checkerboarded throughout the lot of leases and also all the property Emlet owned in Sabine Parish, except some town property not material here. The stated consideration was the payment of Emlet's debts aggregating $11,000 and the drilling of two wells to such depth as Emlet might require, and that when carried out, the agreement would be a full liquidation and settlement of all accounts and transactions heretofore existing between the parties.

Cooke fully carried out his agreement and he and Gay continued operations with the total result that though some oil was found on the assigned leases there was, until the Loring gusher came in, a heavy loss, the expenditures far exceeding the returns. But nearly two years after, on the Loring leases, large production was brought in and they were sold for a large price. Toward the end of the time that Emlet was getting money from Cooke, he was telling his investors, without giving them the name, that he was getting large sums from an "outside party", that this party had put up as much as $300,000 for development and that an interest in the property had been or would be conveyed to him. When he made the assignment to Cooke, after endeavoring in vain to get money from his investors, he wrote them that he had made a fine deal for them, and that if

the development he had secured turned out well, the 4,000 acres of leases he had reserved would be very valuable. On these findings, the court concluding that, though Cooke was not a partner or joint adventurer with Emlet or with the plaintiffs, he knew of the fact of Emlet's relation to these persons and having by threats and coercion compelled Emlet to assign the leases to him, he took them as trustee ex maleficio and was accountable to plaintiffs for all profits received therefrom.

6 The decree appointed a Master to hear and determine the claims of the parties, and to make and state an account between them; appointed a receiver to take charge of the property and the assets of the trust estate and collect and receive any funds or revenues derived therefrom; and made the following findings: that the enterprise and business of acquiring and exploiting oil and mineral leases and exploring for oil and minerals and the sale and disposition thereof heretofore conducted by Emlet, Cooke and Gay, or either of them, in Sabine Parish, Louisiana, be and the same is hereby declared a joint adventure and enterprise for the mutual benefit and profit of the several members thereof and that said business and enterprise and its properties and all the increment and profit thereof and thereon be and the same is hereby declared charged with a lien and trust for the common benefit of the complainants, and it is further found that Cooke and Gay, with knowledge of the trust induced and coerced the said Emlet to transfer and convey to respondent Cooke, the said trust property, and that Cooke and Gay with knowledge that it was trust property, took into their possession, properties of the enterprise and that by reason thereof, they were charged as trustees ex maleficio of said properties and business and enterprise and all the profits and increment thereof, for the benefit of all the members of said joint adventure and enterprise. The Master shall ascertain the amount and value of all the property, money and other things belonging to the joint enterprise, shall then state an accounting and it is further ordered that Cooke, Gay and Emlet shall forthwith deliver to the receiver of the properties of every kind and description now in their possession or under their control and constituting any part of the assets, increment and profits of the joint adventure and enterprise.

that contract, and they had been discharged by its carrying out. He also made it known that the receiver had taken possession of properties other than those acquired by the instrument of February 9, 1928, and sought to obtain their release. On the hearing before the Master, it being made to appear that the Loring operations were the only profitable ones, it was agreed that the hearing should first be limited and restricted to a determination of what properties should be held to constitute the joint enterprise and that if the Loring operations, which were the only profitable ones, were found not to be part of the joint enterprise there would be no necessity for going further while if they were found to be a part of it, the Master would then proceed to an accounting.

The hearing concluded, though it appeared that all of the operations except those on the Loring leases had resulted in a heavy loss and that those leases were not included in the transfer of February 9, 1928, or otherwise acquired from Emlet but were independent acquisitions by Cooke and Gay, the Master nevertheless determined that they were to be regarded as a part of the joint enterprise and Cooke held to be a trustee as to them. He did this on the views advanced by him; that when Cooke took the properties from Emlet under the contract of February 9, 1928, he not only acquired those properties but he took over the conduct and charge of the whole enterprise, that in effect he then entered into a contract of joint adventure with Emlet's associates; and that having entered into it, he was bound to proceed with it for the benefit of them all, in proportion to their contributions, until in some way he had brought the enterprise to an end. So finding he proceeded to an accounting with respect to the Loring operations and the profit derived therefrom. On exceptions to the Master's report, the district judge adhered to his view that Emlet was a trustee of the enterprise which he had been conducting and that Cooke by coercing him to transfer the leases had made himself trustee ex maleficio for plaintiff as to all of the properties he took from Emlet.

But he found;[7] that the properties he took by assignment were worth no more than the obligations he undertook as con-

---

[7] These, in substance, are the findings: that prior to February 9, 1928, there was nothing in Cooke's relation to the matter which obligated him either legally or morally to put any more money in the enterprise, he having already put in $300,000 and that if he had let it alone or had forced the issue through receivership and liquidation instead of coercing Emlet he could have, in competition with his co-investors and the public, purchased all or a part of the assets; that it did not follow though that because his coercion of Emlet had made him trustee ex maleficio as to the assets he got from him, that Cooke was put under a continuing duty to act as trustee; that his conduct imposed upon him the duty of accounting to plaintiffs for what he got from Emlet and prohibiting him from making any unjust profits therefrom. Finding as a fact that the obligations assumed by Cooke when he took over the properties in February, 1928, exceeded the value of the properties, that he had fully discharged these obligations, and that he had reaped no profit from the properties or his use of them, the court found that such obligations to plaintiffs as he had assumed were fully performed and discharged. Finding too that Cooke in his future operations continued to risk his own money and engage in prospecting and development for his own account, not

with any fraudulent purpose but in the exercise of business judgment and that the Loring lands upon which the gusher was found, were lands which Cooke had leased subsequent to the February 28th contract, and which had not by contract of any nature or otherwise, been any part of the joint enterprise, he found that plaintiffs had no interest whatever in that property. He found too that Emlet did nothing toward developing the leases he retained because the purse of Cooke was no longer available and that through circulars he fully informed his investors of what had happened and endeavored to get them to invest more money and finally persuaded them to accept new evidences of their interest. That with knowledge of the trade Emlet had made with Cooke, plaintiffs allowed Cooke to proceed with the expenditures of large sums of money in search for oil upon properties he had acquired in his own name and with his own money and made no claim until some time afterwards.

Based upon these findings he concluded: "The picture revealed by the whole record in the case and after a full hearing before the master is quite different from that drawn in the pleadings and that on which the appellate court ruled in sustaining jurisdiction. Cooke, until his patience with Emlet had become exhausted was in the same situation as hundreds of other small investors * * *

857

sideration for them; that he had not made a profit but a loss as to them; that the Loring properties were not gotten by or through Emlet but through his own independent efforts and with his own funds; that plaintiffs had no interest of any kind in them, and defendants, no obligation of any kind to account to them for the operations or the profits therefrom, and, disagreeing with the Master, he found for the defendants.

We have set out in the margin with some fullness, the district judge's findings, for while both appellants and appellees do make some complaints of the fact findings, the main contention of appellants is, that accepting the judge's findings the decree should have been for them, and of appellees on the merits is, that the decree followed naturally from the findings.

Appellees in addition insist that the record supports no other reasonable conclusions than; that Emlet had complete title to and full authority in law and fact to deal with the properties he assigned Cooke; that Cooke dealt with Emlet in good faith and without oppression or overreaching and particularly without duress; and that under Louisiana law, dealing with Emlet on the faith of the records showing title in him, he acquired the leases as his own and held them for his own benefit, wholly unaffected by any secret equities between Emlet and the plaintiffs; and that the institution of the suit and the procurement of the receivership was wrongful as against them. While urging therefore that the decree, insofar as it denies plaintiffs a recovery, be affirmed, they insist that, so much of the judgment as taxes them with costs, should be reversed.

We disagree with appellants that upon the facts found by the district judge, they were entitled to a decree. We agree with appellees that the decree for them followed the findings inevitably. What was found was; that contrary to their allegations, that they were partners with Cooke and Gay in an oil development adventure and had paid them monies to invest in it, plaintiffs were not associated with them as partners or joint adventurers, and had paid them no monies, and that Cooke and Gay sustained no relation to them whatever except that of trustee ex maleficio as to the leases and property Emlet, under duress as found by the court, had assigned to them; that these leases and properties were worth far less than Cooke and Gay had laid out as consideration for them; and that from their exploitation and development, at Cooke's sole expense, they derived no profit but a heavy loss. That all the profits derived by Cooke and Gay were from properties which, no part of the Emlet leases, had been acquired and developed by them wholly independent of Emlet. On these facts we think it plain that no other judgment could possibly have been rendered on the merits than the one that was rendered.

The theory on which the Master found for plaintiffs and which plaintiffs press here, that by acquiring leases and properties from Emlet, Cooke and Gay became joint adventurers under an obligation to continuously devote their time and money and talents to the service of the plaintiffs, falls flat, with the finding that there was never at any time, any agreement or understanding of any kind that Cooke and Gay or either of them, were or would be joint adventurers with plaintiffs. For, whatever in law a joint adventurer, this case law hybrid of recent origin and undetermined connotation may be,[8] and

and after putting up the large sums of money heretofore mentioned he did not control the management * * * he did not induce anyone to invest * * * in view of the facts the accounting must be confined to what was actually taken over on February 9, 1928, at the value which it then possessed, when tested by every reasonable consideration affecting it. * * * Equity requires a constructive trustee or trustee ex maleficio to restore to those holding any beneficial interest in the property or estate coming under his control, all that he had wrongfully taken and to account for the fruits of his inequitable conduct; but it does not compel him to surrender that which is the produce of his own independent labor and

investment. * * * My view is that, when the equities are balanced, Cooke and Gay do not owe the complainants and others connected with the joint enterprise anything; nor do I feel that the property and funds taken into the hands of the receiver are affected with any lien or claim in favor of the complainants. * * * In view of the circumstances, however, and especially the failure of Cooke to resort to judicial procedure for the settlement of his relations with Emlet and the other investors, instead of adopting the method which he used, I think the costs of this proceeding should be borne by the estate drawn into the hands of the receiver."

8 The now widely recognized legal con-

however difficult to distinguish in particular cases between joint adventures and partnerships, some courts having gone so far as to say that they are subject to the same rules and principles, it is as fundamental to the existence of a joint adventure as it is to the existence of a partnership, that there be a contract between the parties that they are or are to be joint adventurers. As in partnerships, whatever the case as to outsiders, as between the members the relationship of joint adventurers is a matter of intent and arises only where they intend and agree to associate themselves as such. 30 Am.Jur. page 681. It being established here both upon the findings and upon the facts the record discloses, that Cooke never intended to be and never was, either a partner or a joint adventurer with the plaintiffs, the whole theory of recovery based upon the contention that he was, falls to the ground. In his original finding of law and fact that Cooke obtained the assignment of the leases by duress and because he did, though he took it on the faith of the record title in Emlet, he became a trustee ex maleficio of the plaintiffs as to the particular leases taken and liable for profits, if any, secured from them by the expenditure of his own money, time and effort, the court went to the verge in favor of plaintiffs. On no reasonable theory could such a finding be extended to the length plaintiffs would have it go, of making Cooke trustee ex maleficio as to properties other than those acquired from Emlet. But this is not all. We think appellees are right in their claim; that the facts do not support the finding that the assignment was obtained by duress as duress is known · to Louisiana law,[9] and in their claim, that it is quite clear upon the facts that Emlet had full authority to deal with the properties as in his judgment seemed best; that his action in making the assignment was reported to and concurred in by the plaintiffs; and that nothing occurred in connection with it of which plaintiffs can rightfully complain. Further, it is settled Louisiana law, that persons dealing with immovable property, deal with it on the faith of the records and that all contracts and claims not of record or secret equities are void as against third parties [10] and this wholly without regard to whether they are, in fact, known or not known to the third parties.

The theory on which the case was reversed by us when here before is not at all in conflict with these views. We thought and decided there, that plaintiffs having alleged that "each of the appellants furnished money to the three individual appellees, Cooke, Gay, and Emlet, for the purpose of being used in exploring for oil and gas and in acquiring oil and gas leases, in which appellants were to have described interests * * * and that the moneys so furnished were used in acquiring, in the names of individual appellees * * * properties * * * which the individual appellees claim adversely to the appellants," [11] they ought to be permitted to prove, if they could, that this was so, and if they could, defendants ought not, as between themselves and plaintiffs, be permitted to deny the interest of plaintiffs in the properties sued for.

■ The theory which is now sought to to be urged is that though plaintiffs were not partners of or adventurers with Cooke

---

cept of joint adventurers is of modern origin. It has been said to be purely the creature of the American courts. The early common law did not recognize the relationship of co-adventurers unless the elements of a partnership were disclosed and proved. 30 Am.Jur. page 676.

9 The only duress claimed here was a threat of criminal prosecution. Under settled law this is not duress. Article 1856, Louisiana Civil Code. "Threats insufficient to constitute duress.—If the violence used be only a legal constraint, or the threats only of doing that which the party using them had a right to do, they shall not invalidate the contract. A just and legal imprisonment, or threats of any measure authorized by law and by the circumstances of the case, are of this description."

New Orleans & N. E. R. Co. v. Louisiana Const. & Imp. Co., 109 La. 13, 33 So. 51, 94 Am.St.Rep. 395. In addition, conceding that there was duress the facts show complete ratification. L.C.C. Article 1855; Restatement Contracts, Articles 483, 484 and 499.

10 All sales, contracts and judgments affecting immovable property which shall not be so recorded shall be utterly null and void except between the parties thereto. A recording may be made at any time but shall only affect third persons from the time of the recording. C.C. Art. 2266; McDuffie v. Walker, 125 La. 152, 51 So. 100; Masters v. Cleveland, La. App., 158 So. 382; George v. Manhattan Fruit Co., 5 Cir., 51 F.2d 28.

11 Porter v. Cooke, 5 Cir., 63 F.2d 637.

or Gay, though they paid them no monies, and had no agreements or dealing with them, but only with Emlet, Cooke, because he knew that Emlet was dealing with them, could not obtain a good title from Emlet in whose name on the records, the title stood. This is not the law of Louisiana. By permitting Emlet to take the title in himself and deal with the property as his own, plaintiffs, under Louisiana law prevented themselves from asserting their claims against persons who had purchased on the faith of the records without regard to their knowledge of those claims.

█ It remains only to determine whether appellees are entitled to have reversed that part of the decree taxing them with the costs. We think they are. Normally the matter of taxing costs against a fund is within the discretion of the district judge, and this is especially true of receiverships. But where the facts as here show that a receivership was instituted and property was seized upon an unfounded claim, though there is authority to direct that the costs be paid primarily out of the funds, the parties whose property has been wrongfully seized are entitled, on equitable principles, to recover costs from those who have wrongfully provoked the receivership. Cf. Cochrane v. W. F. Potts Son & Co., 5 Cir., 47 F.2d 1026; W. F. Potts Son & Co. v. Cochrane, 5 Cir., 59 F.2d 375; Speakman v. Bryan, 5 Cir., 61 F.2d 430; Bowersock Mills & Power Co. v. Joyce, 8 Cir., 101 F.2d 1000. The judgment will therefore be affirmed on the merits but as to the imposition of costs, it will be reversed with directions to retax costs in accordance herewith.