## SECURITIES AND EXCHANGE COMMISSION, Plaintiff,

v.

INVESTORS SECURITY LEASING CORPORATION, William H. Brown, Dale R. McDonald, William J. Lynam, Defendants.

Hillard KREIMER, Receiver to Collect Assets of Investors Security Leasing Corporation, James W. Thompson and Helen I. Thompson, his wife, Paul A. Blake II, James C. Edwards and Martha Jane Edwards, his wife, Helen A. Kuzma, Margaret Kuzma, Enrico Ialongo and Mary Ialongo, his wife, Agnes B. Macurdy, Plaintiffs,

v.

FIRST NATIONAL BANK & TRUST CO., WASHINGTON, PA., Defendant,

v.

EQUIBANK, N. A., Third-Party Defendant.

Civ. A. No. C.A. 75–1304.

United States District Court, W. D. Pennsylvania.

Aug. 27, 1979.

communications with out-of-state as well as Illinois lot owners.

Alan Z. Lefkowitz, Pittsburgh, Pa., for the receiver.

Frederick J. Francis and Ronald D. Morelli, Pittsburgh, Pa., for the intervenors.

## OPINION

SNYDER, District Judge.

After extended litigation in this case and its companion, *SEC v. Investors Security Corporation,* 415 F.Supp. 745 (W.D.Pa.),[1] the Court has now before it the question of the right, title and interest to certain securities, as between the Receiver for Investors Security Leasing Corporation and the individuals in whose names the securities were issued and registered. We determine that the individual investor's rights to the securities are superior to those of the Receiver.

## I. THE BACKGROUND

At various times during 1973 and 1974, the individual investors involved in this case (Intervenors) turned over their securities to an unregistered corporation, Investors Security Leasing Corporation (ISLC). The agreements in each case were initiated by a salesman for Investors Security Corporation (ISC), a separate corporation and a registered securities broker-dealer, and called for the individual to deposit their securities in return for an obligation to pay interest thereon. Such an agreement was proposed to Paul A. Blake II on or about June 27, 1973 by Franklin Mowry, who had dealt with Mr. Blake, as a representative of ISC, in previous securities transactions. Similar proposals were made by Robert E. Lindsay to Helen A. and Margaret Kuzma in September of 1973, to James C. and Martha Jane Edwards on or about June 27, 1973, and to Enrico and Mary Ialongo in about May of 1973. The Kuzmas, the Edwards, and the Ialongos had dealt with Mr. Lindsey, as a representative of ISC, in previous securities transactions.

Paul A. Blake II, Margaret Kuzma, and Helen A. Kuzma, each received letters dated June 22, 1973, September 24, 1973, and September 24, 1973, respectively, on ISLC letterhead, signed by William H. Brown individually, although he was Vice-President of the corporation, acknowledging receipt of the securities and setting forth the terms and the amount of interest to be paid for the use of their securities deposited with ISLC. Mr. Blake and the Kuzmas accepted the stated terms by signing and returning copies of the letters.

The Receiver for ISLC (Receiver) is in possession of a copy of two letters ad-

1. On August 15, 1975, the SEC obtained a temporary restraining order and sought a permanent injunction against the Investors Security Corporation and its President, William H. Brown, for violation of the Securities Exchange Act of 1934. On September 15, 1975, the Securities Investor Protection Corporation (SIPC), a non-profit corporation created by the Securities Investor Protection Act of 1970 (15 U.S.C. § 78aaa et seq.), applied for and was granted a court declaration that ISC's customers were in need of the Act's protection, at which time a trustee was appointed for the liquidation of ISC.

On October 10, 1975, the SEC filed a complaint against Investors Security Leasing Corporation, its President, Dale R. McDonald, its Vice-President, William H. Brown, and its Treasurer, William J. Lynam, seeking a permanent injunction for violations of the registration and antifraud provisions of the Securities Act of 1933, the Securities Exchange Act of 1934, and the rules thereunder. Upon motion of the SEC, the district court issued a temporary restraining order, freezing the assets of ISLC and appointing a temporary receiver. The receiver has instituted several ancillary proceedings against banks to recover for the corporation securities pledged to the banks by officers of the corporation.

dressed to Mr. and Mrs. Edwards, dated July 11 and July 20, 1973, respectively, also on ISLC letterhead and signed by William H. Brown, acknowledging receipt of the Edwards' securities, setting forth the terms and the amount of interest to be paid for the use of their securities deposited with ISLC, and bearing what purport to be the signatures of Mr. and Mrs. Edwards dated July 30, 1973. The Edwards have no present recollection of the receipt, signing, or returning of said letters, but it was stipulated and agreed that the letters correctly set forth the terms and conditions under which ISLC was permitted to retain possession of the Edwards' securities.

The Receiver is also in possession of a copy of two letters on ISLC letterhead, dated May 28, 1974, and signed by William H. Brown, acknowledging receipt of the Ialongos' securities, and setting forth the terms and the amount of interest to be paid for the use of their securities deposited with ISLC. The Receiver's records do not indicate return of the letters by the Ialongos, and Mr. and Mrs. Ialongo have no present recollection of signing or returning said letters. However, it was stipulated and agreed that the letters correctly set forth the terms of the agreement under which ISLC was permitted to retain possession of the Ialongos' securities.

The letters were all similar in substance to that addressed to James C. and Martha J. Edwards, dated July 11, 1973, which read as follows:

"This is to certify that I am in receipt of

25 Shares of General Public Utilities Corp. # FA132777,

25 Shares of GAF Corp. # J013617,

100 Shares of TraveLodge International, Inc. # NY12316,

100 Shares of Gulf Oil Corp. # E516593,

50 Shares of North American Rockwell Corp. # PO/C58849.

Should you have any need of these Securities, they will be refunded with interest due in 10 business days.

In exchange for the use of your securities, we agree to pay you $12.10 per month, reinvested, beginning August 1, 1973.

I am enclosing two (2) copies of this agreement. The original is for your files and the duplicate is to be signed by you and returned to me in the enclosed envelope.

Should you have any questions, I am sure Mr. Lindsay will be glad to be of service to you.

Sincerely,
/s/ William H. Brown
William H. Brown

Accepted by:
/s/ James C. Edwards
James C. Edwards
/s/ Martha Jane Edwards
Martha Jane Edwards
    7-30-73
Date"

All the letters were signed by William H. Brown individually, although he was Vice-President of ISLC and President of ISC.[2]

Pursuant to the letter-agreement, interest was accrued and recorded on the books of ISLC with respect to Mr. and Mrs. Edwards, Mr. and Mrs. Ialongo, and the Kuzmas. Mr. Blake received monthly payments from ISLC pursuant to his letter-agreement each month commencing August 1, 1973 through June 1, 1975. The July 1, 1975 check from ISLC was returned for insufficient funds, and Mr. Blake received no further payment of interest from ISLC.

At the time the securities were turned over to the salesmen, a "Security Receipt" from ISLC was given by the salesmen. These securities were maintained on ISLC's books, reflecting the deposit of securities and the payment or accrual of interest as above set forth.

The First National Bank & Trust Company of Washington, Pa. (First National) extended personal loans to Dale R. McDonald

---

2. The Blake letter said, "Should you have any need of this money, it will be refunded with interest due in 10 business days."

and William J. Lynam, who were officers and shareholders of ISC and ISLC, as follows:

| Loan Number | Date of Loan | Total Principal Amount of Loan |
|---|---|---|
| 2471 | June 2, 1972 | $150,000.00 |
| 2921 | June 21, 1973 | 16,000.00 |
| 2955 | July 16, 1973 | 40,000.00 |
| 2977 | August 1, 1973 | 350,000.00 |

The August 1, 1973 loan incorporated the $206,000.00 balances of the three previous loans.

The securities of Mr. Blake, Mr. and Mrs. Edwards, and the Kuzmas were used as collateral by Lynam and McDonald for the July 16, 1973 loan and the August 1, 1973 loan which incorporated all prior loan balances. The Ialongo securities were deposited with First National as collateral by Lynam and McDonald for the August 1, 1973 loan. Lynam and McDonald defaulted in payment of said loans, and First National claimed a security interest in Intervenors' securities adverse to claims of ownership asserted by both the Intervenors and the Receiver.

At no time were any of the Intervenors informed that their securities would be used as collateral to secure personal loans. In fact, however, the securities were used as collateral for the personal loans of McDonald and Lynam without the knowledge or consent of the owners. Even when the securities were presented to First National as collateral, the Bank did not notify any of the owners of the existence of the personal loans to Lynam and McDonald, or of the fact that their (the owners) securities were being used as collateral for such loans. Furthermore, at all times material hereto, these securities remained registered in the names of their owners.

The Officers of ISLC were: Dale R. McDonald, President; William H. Brown, Vice-President; and William J. Lynam, Treasurer. The Officers of ISC were: William H. Brown, President, and Jane Brown (his wife), Vice-President and Secretary-Treasurer.

On October 10, 1975, on motion of the Securities and Exchange Commission (SEC), the assets of ISLC were taken under the control of the Court, to be administered by a Receiver with plenary power, including the power to commence suit on behalf of ISLC and to collect all assets of the corporation for the benefit of the shareholders and creditors. This action was upheld by the United States Court of Appeals for the Third Circuit, *SEC v. I. S. C.,* 560 F.2d 561 (3rd Cir. 1977). On October 29, 1976, the Receiver commenced the ancillary action against First National, asserting in his complaint that the securities were assets of ISLC, pledged without the authority of the corporation, and that the Receiver had the right to recover the securities for the benefit of the corporation's creditors. The Intervenors, as noted, were the registered owners of the securities in question.

The Intervenors have agreed with the Receiver, First National, Equibank, N. A., and other parties of record, to a settlement of their respective claims in the action as set forth in the Agreement and Stipulation of Settlement presented to and approved by the Court on February 28, 1978. Under this agreement, 30% of the net proceeds was retained by First National and 70% was turned over to the Receiver, subject to the additional agreement between the Receiver and the Intervenors to resolve their conflicting claims of right, title and interest to the securities. This Receiver-Intervenors Agreement provides in Paragraph 3, as follows:

"(a) 50% of the total net proceeds of the said Securities shall be immediately transmitted to the individual record security holders . . ..

(b) The remaining 20% of said proceeds shall be distributed to that party, either the Receiver or the Intervenors, as may be determined by the Court to have the superior right, title and interest to the Securities.

(c) The Receiver and Intervenors agree to submit to the Court, with the right of appeal, the narrow legal question of the right, title and interest, as between Receiver and Intervenors, to the Securities, determined as of the time of commence-

ment of the ancillary action, without regard to any subsequent transfers of title which may have occurred pursuant to the Agreement and Stipulation of Settlement."

In summary, ISLC obtained possession of the securities of each of the Intervenors under an agreement whereby, in return for the use of their securities, the owners of the securities would receive interest, paid to them or credited to their account, and would be entitled to the refund of the securities upon demand within ten business days. In each case, the proposal that the Intervenors enter into such an arrangement was made by an ISC salesman, a broker-dealer of securities with whom each Intervenor had previously dealt in other securities transactions.

Briefs were received from counsel, following the filing of a detailed stipulation, and the matter is now ripe for decision.

## II. DISCUSSION

The question is: Do the Intervenors have right, title and interest in the securities registered in their names and held as collateral by First National, superior to that possessed by the Receiver for ISLC?

■ We begin our analysis by noting that the proceeding here is not under the Bankruptcy Act, 11 U.S.C. § 1 et seq., nor under the Securities Investor Protection Act (SIPA), 15 U.S.C. § 78aaa et seq. Rather, the appointment of the Receiver was an appropriate exercise of the equitable power and discretion which the Court

retains under the Securities Exchange Act of 1934. See SEC v. Investors Security Corporation, supra.

We note in SEC v. First Securities Co., 507 F.2d 417 (7th Cir. 1974), involving proceedings on the equitable receivership of a securities brokerage firm, the circuit court found "reasonable", the district court's selection of the formula of the Bankruptcy Act, 11 U.S.C. § 96(e) (applicable to a bankrupt stockbroker),[3] to govern the liquidation.[4] In essence, the court held that Section 60(e) was enacted to provide a standard for determining the rights of brokerage house customers in bankruptcy proceedings, and, in particular, "[to] secure equality of treatment for, 'the public customer who has entrusted securities to a broker for some purpose connected with participation in the securities markets.'" Citing SEC v. F. O. Baroff Co., Inc., 497 F.2d 280, 283 (2nd Cir. 1974).

■ In this situation, we see no difference in purpose or principle which would militate against resorting to Section 60(e) for a formula for an equitable solution of similar conflicts in interest in a receivership liquidation. As was true with Section 60(e), there would appear to be a need to create rules which would have uniform application and not vary in state-by-state adjudications. Tepper v. Chichester, 285 F.2d 309, 311 (9th Cir. 1960).

Both the Receiver and the Intervenors resist application of Section 60(e). The Intervenors emphasized at oral argument that

3. The Bankruptcy Act, Sec. 60, sub. e, 11 U.S.C. § 96(e)(1) defines "customers" of a stockbroker as including "persons who have claims on account of securities received, acquired or held by a stockbroker from or for the account of such persons . . . (f) by way of loans of securities by such persons to the stockbroker, and shall include persons who have claims against the stockbroker arising out of sales or conversions of such securities."

4. 11 U.S.C. § 96(e)(2) provides that such property and the proceeds of any such property which had been unlawfully converted by the stockbroker constitute a single and separate fund to be shared in by all of the separate class of creditors on a pro rata basis in accordance

with their net equities. The fund may be impressed with the costs and expenses set forth in Clause (1) and (2) of subdivision (a) of Section 104 (costs of administration on recovery of property and wage claims). The only group of customers exempted from this provision are "cash" customers who are able to identify specifically their property in the manner prescribed in Paragraph (4) of this subdivision. Paragraph (4) provides that no cash or securities are deemed to be specifically identified, unless it remained in the stockbroker's possession. The facts stipulated show that the securities had not remained in the possession of the stockbroker, but had been pledged to a bank as collateral security for loans to the stockbroker.

the stipulated facts provide an insufficient basis for a finding that ISLC is a stockbroker under the recently stated requirement of *In the Matter of Paragon Securities Company,* 599 F.2d 551 (3rd Cir. 1979). Paragon had filed a petition for voluntary dissolution and obtained the appointment of a receiver. It had been engaged in the business of buying and selling securities (primarily municipal bonds) and when it went out of business in August of 1973, it left a number of competing claims to securities under its control. The court held that a prerequisite to the applicability of Section 60(e) was a finding that the bankrupt was a stockbroker, and concluded that a stockbroker should be defined as any person "engaged in the business of effecting [securities] transactions for the account of others." The court of appeals pointed to the prior conflicts of state law and concluded that 60(e) should be the exclusive remedy for stockbrokers' bankruptcies. We see nothing in the definition prescribed by the court of appeals which would prevent application here of the Section 60(e) formula. We have previously held in this litigation that ISLC is nothing more than the alter ego of ISC, which is a registered broker-dealer of securities, and we are convinced that the 60(e) formula is the proper one for application in this situation.

In looking at the formula of Section 60(e), we find that customer claimants are divided into three classes:

1.  Cash customers who are able to specifically identify their securities in accordance with the provisions of Section 60(e)(4). These customers are permitted reclamation of their securities.

2.  All other customers. The property of these customers constitutes a single and separate fund for the payment of customers' claims on a pro rata basis.

3.  General creditors. This class includes those customers whose claims cannot be satisfied from the single and separate fund.

Having decided that Section 60(e) is applicable here, we must then determine whether the claimants are entitled to reclamation. Section 60(e)(2) allows reclamation where the cash customers are able to identify specifically their property.

We find that there is every reason to treat the Intervenors in this case as cash customers in the sense that they were entitled to immediate possession of securities under the agreements without paying any sum to the stockbrokerage firm, *see Mardick v. Stover,* 392 F.2d 561 (9th Cir. 1968); *Tepper v. Chichester, supra,* and thus are entitled to reclamation if the securities are specifically identifiable, that is that:

1.  they remained in their identical form in the stockbroker's possession until the date of bankruptcy; or

2.  they were allocated to or physically set aside for a cash customer, either

    a.  more than four months before bankruptcy, or

    b.  at the time while the stockbroker was still solvent, and remained so allocated or set aside at the date of bankruptcy.

It is obvious under the findings of fact as they appear above that the securities were not in the stockbroker's possession at the time of the pledge of these securities on the private obligations of Lynam and McDonald, but we see no reason for not determining by analogy that these securities remained in their identical form, although pledged as hereinabove set forth.

Next, we must determine whether the Intervenors were "customers of the stockbroker" within the intendment of Section 60(e), as including "persons who have claims on account of securities received, acquired, or held by the stockbroker from or for the account of such persons (a) for safekeeping, or (b) with a view to sale, or (c) to cover consummated sales, or (d) pursuant to purchases, or (e) as collateral security, or (f) by way of loans of securities by such persons to the stockbroker, and shall include persons who have claims against the stockbroker arising out of sales or conversions of such securities."

Clearly, the Intervenors here were persons who had "entrusted securities to a

broker for some purpose connected with [the] participation in the securities markets." *SEC v. F. O. Baroff Co., supra.* We distinguish the facts in *Baroff* where a person loaned stock to a brokerage firm to help it out of a short cash position. He did not intend to use the stock as collateral for margin purposes, nor did he have an open account with the firm. The court, therefore, held he was not a customer of the brokerage firm. *See also, Securities Investors Protection Corporation v. Executive Securities Corporation,* 556 F.2d 98 (2nd Cir. 1977).

The Intervenors here loaned ISLC their securities in return for an interest payment, retaining the right to a refund of the securities within ten days. Clearly, this is "participation in the securities market" and the Intervenors were not creditors of ISLC, but were "investors and traders" within the intendment of Section 60(e).

It appears to be undisputed that at no time did the Intervenors' securities become assets of ISLC. The terms and conditions under which the securities were permitted to remain are clearly set forth hereinabove. There is nothing in the contractual terms to even suggest remotely that the securities were given to or sold to ISLC, where the agreement provided they were to be "refunded". The securities remained at all times registered in the names of the Intervenors, and the very structure of the transaction by which First National secured them as collateral for personal loans is inconsistent with any contention that the securities were assets of ISLC.

We are not here called upon to decide the rights the Intervenors might have had, vis-a-vis third persons to whom McDonald or Lynam might have hypothecated the stock. Our holding here is simply that the Receiver cannot receive for ISLC's general creditors property which never belonged to ISLC. *Cf. In re Buna Painting & Drywall Co.,* 503 F.2d 618 (9th Cir. 1974).

▮ Finally, in his original brief, the Receiver urges that the Court exercise its equitable powers and compensate the Receiver for his services. The Court has discretion to determine liability for receivership expenses, including compensation for the receiver and counsel fees. *Bowersock Mills & Power Co. v. Joyce,* 101 F.2d 1000 (8th Cir. 1939). Generally, the courts hold that a receiver's compensation and the expenses necessarily incurred by him in preserving and caring for the property under an order of court are primarily a charge on and should be paid out of the fund of property in his hands. 75 C.J.S. *Receivers* § 302. *See Porter v. Cooke,* 127 F.2d 853 (5th Cir.) cert. denied 317 U.S. 670, 63 S.Ct. 75, 87 L.Ed. 538 (1942); *Bowersock Mills & Power Co. v. Joyce, supra; SEC v. Fifth Ave. Coach Lines, Inc.,* 364 F.Supp. 1220 (S.D.N.Y.1973); *Darling v. Cornstalk Products Co.,* 54 F.2d 670 (E.D.Ill.1931). Here, the Settlement Agreement does not allow such allocation of expenses.

An appropriate Order will be entered.

## ORDER

AND NOW, to-wit, this 27th day of August, 1979, under the Agreement and Stipulation of Settlement between the parties to this case, which brought before the Court the narrow legal question of the right, title, and interest as between the Receiver and the Intervenors to the securities as of the time of commencement of the ancillary action, and upon due consideration of the arguments and briefs of counsel, the Stipulation of Facts, and for the reasons set forth in the Opinion filed herewith,

IT IS HEREBY ORDERED, ADJUDGED AND DECREED that the rights of the Intervenors to the securities here involved are superior to those of the Receiver, and the securities are directed to be delivered to the registered owners, or the proceeds thereof.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the Request of the Receiver for attorney fees, Receiver's compensation and expenses is hereby denied.