**SECURITIES AND EXCHANGE COMMISSION, Plaintiff,**

v.

**ELMAS TRADING CORPORATION, Republic Overseas Bank, Ltd., James L. Attarian and Donald D. Smith, Defendants.**

**No. CV–R–85–263–ECR.**

United States District Court, D. Nevada.

July 15, 1987.

Robert D. LaFramenta and Maureen Shanahan, Securities and Exchange, Los Angeles, Cal., for plaintiff.

Thomas J. Nolan and Maryann R. Marzano, Los Angeles, Cal., for Elmas Trading Corp. and Republic Overseas Bank, Ltd.

James L. Attarian, pro se.

Jerrold M. Ladar, San Francisco, Cal., for Donald D. Smith.

Gary W. Duhon, Reno, Nev., for Hugo M. Pfaltz, Jr., claimant.

## ORDER

EDWARD C. REED, Jr., Chief Judge.

The Receiver has moved the Court to allow the claim of Hugo M. Pfaltz in the sum of $30,114.00. In reaching this total, the Receiver has applied § 502(b)(6) of the Bankruptcy Code, which sets forth certain limitations on the amount of claims allowable by a lessor of real estate. The claimant, Pfaltz, contends that the application of the Bankruptcy Code in a securities receivership is improper, and that the total amount of the claim should be determined by the law of the real property's situs, New Jersey. It appears to the Court that application of this section of the Bankruptcy Code is proper, and the amount of the claim will be determined according to § 502(b)(6).

## FACTS

Elmas Trading Corporation was an organization concocted by James L. Attarian and several of his associates, ostensibly for the purpose of engaging in arbitrage trading. These individuals created a variety of other fictitious organizations, most notably Republic Overseas Bank, Ltd. (ROBL), in order to solicit "investments" from the unknowing public. Attarian and his cohorts were hugely successful in extracting money from would-be investors, having accumulated some $70 million by the time this receivership was created. Little, if any, of the investors' money was ever used for arbitraging. Most of the funds were simply misappropriated by the promoters or used to pay the commissions of the financial consultants who sold shares in the investment program. The entire system, therefore, amounted to a Ponzi scheme of Herculean proportions.

In October, 1984, Attarian, acting on behalf of Elmas, rented office space from Pfaltz in New Jersey. The lease provided that Elmas would rent 2,868 square feet of space in Pfaltz's office building at a monthly rate of $4,032.00. The lease term began on November 1, 1984, and expired on October 31, 1989. Elmas ceased paying rent on the leasehold in May, 1985, at approximately the time this receivership began. Pfaltz re-entered the premises on April 1, 1987, and rerented it at a slightly reduced rate.

## DISCUSSION

The issue in this matter is deciding how the claim of Pfaltz should be calculated. Neither party contests the application of a 50% reduction of the claim, inasmuch as most other trade creditors have also only received 50% of their claims. The two methods of computing the claim diverge greatly, however. The claimant, for example, contends that New Jersey law controls. Although no New Jersey cases or statutes have been cited to the Court, it appears that this would involve a standard computation of damages for a breached lease. The Receiver's estimate of the amount of

unpaid rent, less any mitigation, equals approximately $140,000. Under the 50% reduction, the claimant would then receive approximately $70,000.

The Receiver, on the other hand, proposes that the Court apply § 502(b)(6) of the Bankruptcy Code. This section provides that

> (b) Except as provided in subsections (e)(2), (f), (g), (h), and (i) of this section, if [an] objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim as of the date of the filing of the petition, and shall allow such claim in lawful currency of the United States in such amount, except to the extent that—

> •   •   •   •   •

> (6) If such claim is the claim of a lessor for damages resulting from the termination of a lease of real property, such claim exceeds—

> (A) the rent reserved by the lease, without acceleration, for the greater of one year, or fifteen percent, not to exceed three years, of the remaining term of the lease, following the earlier of—

> (i) the date of the filing of the petition; and

> (ii) the date on which the lessor repossessed or the lessee surrendered, the leased property, plus

> (B) any unpaid rent due under such lease, without acceleration, on the earlier of such dates.

11 U.S.C. § 502(b)(6).

According to the Receiver's calculations, this section would limit the claim to: (1) $4,302 × 12 months, or $51,624.00; plus (2) $4,302 × 2 months (assuming that as of the date of the beginning of the receivership, two month's rent was outstanding), or $8,604. Under the Receiver's calculations, the claim would be only $60,228, and the 50% reduction would net the claimant $30,114.

It appears to the Court that this bankruptcy section can be applied to this lease dispute. Initially, the more recent cases have applied bankruptcy code sections in securities receiverships. In *SEC v. First Securities of Chicago*, 507 F.2d 417 (7th Cir.1974), the court held that a court could use the principles of the Bankruptcy Act in analogous securities receiverships. In this case, the president of First Securities had described in a suicide note spurious escrow accounts which he had created, and which rendered the company bankrupt. The Securities and Exchange Commission stepped in immediately and commenced a receivership, in order to distribute the company's remaining assets equitably. *Id.*, at 419. In the course of this distribution, the district court ordered that § 60(e) of the Bankruptcy Act would provide an equitable means for the classification and distribution of the receivership assets. *Id.* The claimants adversely affected by this order, the "escrow claimants," objected to this order on various grounds.

The escrow claimants first argued that securities receiverships are equitable proceedings, and that only an equal distribution among creditors would serve equitable principles. *Id.*, at 420. Therefore, they contended that application of the bankruptcy section, which would reduce their claims by approximately 20%, was improper.

The court disagreed. The position of the escrow claimants gave no recognition to the fact that most of the available assets of the company represented cash or securities entrusted to First Securities by its customers for purposes incidental to the ordinary course of the company's business. *Id.* Because the majority of the First Securities assets were not technically owned by the company, the court found that § 60(e) was applicable.

This old section of the Act provided standards for determining the rights of a brokerage house's customers in bankruptcy proceedings. *Id.*, (citing H.Rep. No. 1409 on H.R. 8046, 75th Cong., 1st Sess. 31 (1937)). In this regard, the purpose of the statute was to "protect, and secure equality of treatment for, 'the public customer who has entrusted securities to a broker for some purpose connected with participation in the securities markets.'" *Id.*, (*citing SEC v. F.O. Baroff Co., Inc.*, 497

F.2d 280, 283 (2nd Cir.1974)). In the opinion of the court, there was no difference in purpose or principle which would counsel against the application of § 60(e) in a securities receivership setting. *Id.* Because the conflicts between the different classes of creditors and claimants in the receivership were identical to that of a bankruptcy proceeding, the court found application of § 60(e) appropriate.

Where receivership distribution questions pose problems similar to those which have been resolved by the Bankruptcy Code, therefore, it is proper to apply that law. *Id.; see also S.E.C. v. Investors Security Leasing Corp.*, 476 F.Supp. 837, 842 (W.D.Pa.1979). This Court has, on two separate occasions, had the opportunity to consider application of various bankruptcy code sections. In January, 1986, the Court held that the formation of the Depositor Advisory Committee should not be governed by the relevant bankruptcy code section, inasmuch as that method of selection was inappropriate. *S.E.C. v. Elmas Trading Corp.*, 625 F.Supp. 890, 891 (D.Nev. 1986). Because of the large number of depositors in this case, the Court found that, as a simple matter of practicality, the bankruptcy code method of selecting committees would be too unmanageable and would involve great expense. The Court did stress, however, that the receivership has strong ties to bankruptcy. *Id.*, citing LR 21(i).

Those ties were made even more clear in January, 1987. At that time the Court applied the doctrine of equitable subordination to reduce the claims of certain financial consultants. Although not codified in the bankruptcy code itself, the doctrine is a creature of insolvency proceedings, and the Court relied extensively on bankruptcy case law in determining whether the claims of the financial consultants should be equitably subordinated to those of the general class of claimants. Because the inequitable conduct of the financial consultants would have made them prime candidates for subordination in an analogous bankruptcy proceeding, the Court held at that time that the bankruptcy doctrine should be employed in this case.

The claimant contends, however, that Supreme Court precedent prevents the application of bankruptcy statutes in equity receiverships. Relying on *William Filene's Sons Co. v. Weed*, 245 U.S. 597, 38 S.Ct. 211, 62 L.Ed. 497 (1917), the claimant argues that this Court is restricted from applying any law other than that of the state of New Jersey in this case. It appears, however, that the *Filene's Sons* case is distinguishable from the present case on its face, and should not be construed as binding precedent.

In *Filene's Sons*, receivers had been appointed for the Butler company upon the motion of creditors to continue running the business until the company's assets could be applied in satisfaction of its debts. The receiver's requested instructions as to the amount to be paid to the petitioner, William Filene's Sons Co., under a lease into which the Butler company had entered. This lease was in fact a sublease by the terms of which the Butler company agreed to pay all of the rent due under the master lease as well as an additional $20,000 yearly, payable in monthly installments. The property subject to the lease were five parcels of land held by Filene's Sons. The master lease and the sublease provided for re-entry in case of the failure of the lessee or the sublessee to perform any covenant, of bankruptcy, or of the appointment of a receiver.

In December of 1912, the receivers of the Butler company elected not to assume the sublease and left the rent due on the beginning of that month. The petitioner then re-entered the property and demanded that the receiver pay the sums due under the lease. Under the petitioner's calculations, the receiver owed $20,000 per year from December 9, 1912, (the date of re-entry) until February 28, 1921, (the lease's termination date).

The lower courts had rejected this claim. The district court had found that the $20,000 yearly rent provided for in the sublease was merely an addition, and that the provision for payment on the termination of the lease was an attempt to secure a prefer-

ence by accelerating the installments. By analogy to the law of bankruptcy, the district court invalidated the additional rent. The circuit court upheld this decision, finding that the commencement of the receivership had the same effect as a petition in bankruptcy in preventing claims that were not provable as of the date of the petition.

The Supreme Court reversed. Initially, it found that the $20,000 additional rent in the sublease was not in the nature of a preference or a penalty, inasmuch as the figure was "dealt with as a separate item and as the inducing consideration for the sublease, the right to the whole of which was earned when the sublease was made." Id., at 601, 38 S.Ct. at 213. The entire amount of the petitioner's claim, the Court concluded, had to include the additional rent under the sublease, as there was no basis, statutory or otherwise, that justified excluding this amount. Thus, the Court concluded that the lower courts had had no authority to apply bankruptcy principles so as to exclude completely the additional rent. Id., at 601–02, 38 S.Ct. at 213.

The claimant naturally contends that *Filene's Sons* controls the present matter, thereby preventing this Court from applying Code § 502. *Filene's Sons*, however, is distinguishable from the present case for a variety of reasons. First, the receivership in that case involved the appointment of receivers for the purpose of running a business until the assets of that business could be applied in complete satisfaction of the company's debts. In contrast, the present receivership involves the distribution of a finite amount of assets to the investors who were duped into placing their money into the scheme. Whereas the *Filene's Sons* creditors could reasonably hope to recoup close to their initial claim, the investors in this receivership will be fortunate to receive 50% of their investment with Elmas. This receivership, therefore, is much more closely analogous to an actual bankruptcy proceeding than that involved in *Filene's Sons*.

In addition, the receivers in *Filene's Sons* were attempting to exclude completely the amount of the petitioner's claim. In this case, the Receiver does not seek to exclude Pfaltz's claim entirely. Instead, the Receiver proposes to limit that claim so as to compensate the claimant without unfairly depriving other creditors and investors of assets which are due them. Because the present proceeding is strongly analogous to bankruptcy proceedings, the Receiver argues that the bankruptcy section should be applied.

In view of the similarity in purpose between bankruptcy proceedings and this equity receivership, the Court now holds that § 502(b)(6) of the Code should be applied in this case. As the Court has previously noted, all bankruptcy proceedings are closely related to equity receiverships. That relation is made even more strong in this instance, inasmuch as the purpose of § 502(b)(6), as expressed in the legislative history, has equal relevance here.

That history reveals that this section was enacted specifically to limit the claims of real estate lessors, which tended to overwhelm the remainder of the estate. The House Judiciary Report noted that "[the section] was designed to compensate the landlord for his loss while not permitting a claim so large (based on a long-term lease) as to prevent other general unsecured creditors from recovering a dividend on the estate." H.Rep. No. 95–595 to accompany H.R. 8200, 95th Cong., 1st Sess. 353–55 (1977), U.S.Code Cong. & Admin.News 1978, pp. 5787, 6309. In addition, the histories indicate that it has been considered proper to limit the claims of real estate lessors because the amount of the lessor's damages was considered contingent and difficult to prove. In addition, in a true lease of real estate (as opposed to lease financing), the lessor retains all of the risk and benefit as to the value of the property at the termination of the lease. S.Rep. No. 95–989 to accompany S. 2266, 95th Cong., 2d Sess. 64, 65, 74 (1978). Because of these two factors, Congress concluded that it was proper to limit the amount of the real estate lessor's claim.

The factors which Congress enunciated in enacting § 502(b)(6) also have relevance here. It seems important to allow the real

estate lessor some part of his claim against the receivership estate, but it seems equally important to limit that claim so as not to overshadow the claims of the other creditors. The average investor claimant against this estate has or will receive approximately 38% of his claim against the estate, and may eventually receive close to 50%. But it must be remembered that this total sum will be rather modest in comparison to the claim of Pfaltz. Because the average investment in the trading scheme was about $15,000, the average return will probably be much less than $7,000. Allowing Pfaltz's claim of over $140,000 would dwarf the recoveries of most investors, who are the individuals on whose behalf the receivership was instituted in the first place. Although the allowance of Pfaltz's total claim would subtract only incremental amounts from the return of any specific investor, it appears improper to the Court to allow such a large claim against the estate where the investors themselves are receiving so little.

In addition, it appears proper to limit the amount of the claim in accordance with the bankruptcy section, inasmuch as the damages in this case are as contingent as all real estate damages. The Receiver, in its motion, has argued that the claimant's attempts to mitigate damages have been insufficient, and that the claim should be reduced on that basis. While the Court does not decide this matter, it does point out the fact that the calculation of these types of damages often involve difficult issues of fact. Moreover, the lessor in this case still retains the ownership of the property, and all of the benefits derived therefrom. None of the investors retains anything from their experiences with Elmas but a bad taste in his mouth. Because this claimant still retains ownership of his realty, it seems proper to limit his claim more severely than that of the other claimants.

The Court is mindful of other cases cited by the claimant which have applied state law to determine claims in receivership settings. *See e.g., Leo v. Pearce Stores Co.,* 54 F.2d 92, 93 (E.D.Mi.1931) (court applied Michigan law in determining claims of landlords against receivership estate). For the

most part, however, the cases are very old, and do not analyze the factors which this Court has found to be relevant. Based upon the existence of newer authority which does support the application of the bankruptcy code sections, the Court will reject the older line of authority, and will follow the course charted by *First Securities of Chicago, supra,* pg. 118 and *Investors Security Leasing Corp., supra,* pg. 119.

IT IS, THEREFORE, HEREBY ORDERED that the Receiver's motion to allow the claim according to § 502(b)(6) of Title 11 of the United States Code is GRANTED.

IT IS FURTHER ORDERED that the claim of Hugo Pfaltz shall be allowed in the sum of $30,114.00.