**John K. MARDICK et al., Appellants,**

**v.**

**Elizabeth STOVER, Trustee, etc., Appellee.**

**No. 21236.**

United States Court of Appeals
Ninth Circuit.

Feb. 6, 1968.

As Modified on Denial of Rehearing
May 21, 1968.

562

William Browning (argued), of Rees, Estes & Browning, Tucson, Ariz., for appellant.

Thomas W. Murphy (argued), Phoenix, Ariz., for appellee.

Before MERRILL, KOELSCH and ELY, Circuit Judges.

MERRILL, Circuit Judge:

This appeal is taken from an order of the District Court for the District of Arizona affirming a decision of the Referee in Bankruptcy and from an order of the District Court denying appellants' motion to amend judgment.

Appellee is the trustee in bankruptcy of Alpha Securities Co., an Arizona corporation formerly doing business as a stockbroker in Phoenix and Tucson, Arizona. Appellants, asserting rights as cash customers under § 60e of the Bankruptcy Act, 11 U.S.C. § 96(e),[1] seek

---

1. Paragraphs (2) and (4) are relevant to the problems here presented. They provide as follows:

"(2) All property at any time received, acquired, or held by a stock-broker from or for the account of customers, except cash customers who are able to identify specifically their property in the manner prescribed in paragraph (4) of this subdivision and the

to reclaim as their property shares of stock which were in the bankrupt's possession at the time of bankruptcy. The Referee and the District Court both held that appellants were not entitled to relief under § 60e and this appeal was taken.

## MOTION TO DISMISS

Appellee claims that the appeal was not timely. The District Court order from which the appeal was taken was entered March 24, 1966. Appellants moved to amend judgment on April 1, 1966, within the ten days allowed by Fed. R.Civ.P. 59, made applicable to bankruptcy proceedings by General Order 36, 11 U.S.C.A. following § 53. The motion was denied by the District Court on April 19, 1966, the court stating that the motion had been "duly considered." This appeal was taken May 27, 1966.

The appeal thus was taken within the 40 days allowed by § 25 of the Bankruptcy Act, 11 U.S.C. § 48, if time is to be computed from the order denying amendment of judgment, but not if it is to be computed from the original order. Fed.R.Civ.P. 73 provides:

"The running of the time for appeal is terminated as to all parties by a timely motion made by any party pursuant to any of the rules herein-after enumerated, and the full time for appeal fixed in this subdivision commences to run and is to be computed from the entry of any of the following orders * * * granting or denying a motion under Rule 59 to alter or amend the judgment * * *."

This rule applies to bankruptcy proceedings when the motion is entertained by the District Court. Wayne United Gas Co. v. Owens-Illinois Glass Co., 300 U.S. 131, 57 S.Ct. 382, 81 L.Ed. 557 (1937); Carpenter, Babson & Fendler v. Condor Pictures, Inc., 108 F.2d 318 (9th Cir. 1939); Ribaudo v. Citizens Nat'l Bank of Orlando, 261 F.2d 929 (5th Cir. 1958); 2 Collier, Bankruptcy § 25.07 (1966).

That the motion to amend judgment was entertained by the District Court in this case appears from the court's recital that the motion was duly considered.

The motion to dismiss is denied.

## MERITS OF THE APPEAL

Appellee makes the preliminary contention that appellants' right to reclaim property in the trustee's hands is barred by their election to proceed as a creditor, manifested by their having originally filed a creditor's claim.

---

proceeds of all customers' property rightfully transferred or unlawfully converted by the stockbroker, shall constitute a single and separate fund; and all customers except such cash customers shall constitute a single and separate class of creditors, entitled to share ratably in such fund on the basis of their respective net equities as of the date of bankruptcy: *Provided, however*, That such fund shall to the extent approved by the court be subject to the priority of payment of the costs and expenses enumerated in clauses (1) and (2) of subdivision (a) of section 104 of this title. If such fund shall not be sufficient to pay in full the claims of such class of creditors, such creditors shall be entitled, to the extent only of their respective unpaid balances, to share in the general estate with the general creditors.

\* \* \* \* \*

(4) No cash received by a stockbroker from or for the account of a customer for the purchase or sale of securities, and no securities or similar property received by a stockbroker from or for the account of a cash customer for sale and remittance or pursuant to purchase or as collateral security, or for safekeeping, or any substitutes therefor or the proceeds thereof, shall for the purposes of this subdivision (e) be deemed to be specifically identified, unless such property remained in its identical form in the stockbroker's possession until the date of bankruptcy, or unless such property or any substitutes therefor or the proceeds thereof were, more than four months before bankruptcy or at a time while the stockbroker was solvent, allocated to or physically set aside for such customer, and remained so allocated or set aside at the date of bankruptcy."

■ The claim, however, although made upon a printed creditor's claim form, clearly shows that appellants were seeking a return of the shares of stock involved. At no time have they asserted rights inconsistent with this position. We find no merit in this contention of the trustee.

The principal issues presented by this appeal relate to appellants' right to reclaim stock as cash customers of the bankrupt under § 60, sub. e.

On November 14, 1961, appellants placed "stop-loss" orders with the bankrupt for the sale of 25 shares of Amerada Petroleum Co. owned by Millicent I. Mardick, and 107 shares of Union Oil Co. of California, owned by John K. Mardick, if the market price for these shares should fall to certain levels. The certificates were in appellants' possession and registered in the respective names of the owners. On November 27 the bankrupt notified appellants that it had sold their shares pursuant to their order and they immediately endorsed the certificates in blank and sent them to the bankrupt. Two days later they learned that the market had not fallen to the levels prescribed by their sell orders and that the sales had been made through mistake. They demanded that the shares be replaced in kind. The bankrupt complied by making a purchase of the same blocks of shares but at a price now increased by $604.44 over the sale price of $9,154.53. The bankrupt made good the difference.

The bankrupt did not own a seat on any exchange and accordingly had to deal through a broker who had one. The replacement shares were obtained from the broker who had made the prior sales. They were sent to the transfer agent who issued certificates in the name of the bankrupt and delivered them. The bankrupt, in turn, sent the certificates, endorsed in blank, back to the transfer agent for issuance of certificates in the name of the Mardicks, but the transfer fees were not paid so the street-name certificates were returned to the bankrupt. They were in its possession in this form at the time of the bankruptcy.

The bankrupt filed its petition in bankruptcy on February 13, 1962. It had been insolvent at all times for more than four months prior to that date, including the time when the events described above took place.

Section 60, sub. e establishes the customers of a bankrupt stockbroker as a single separate class of creditors. It establishes as a separate fund for the benefit of this class all property acquired from or held for customers. The only customers excepted from this class, and whose rights to reclaim property are unaffected, are cash customers who can specifically identify property held by the bankrupt as their own. "Cash customers" are defined in paragraph (1) of the section as "customers entitled to immediate possession of such securities without the payment of any sum to the stockbroker." The section's intent is summarized as follows in MacLachlan, Bankruptcy § 280, page 323 (1956):

> "Section 60e adopts the theory that all the customers of a broker who permit him to have wide powers over their securities are subjecting themselves to the common risk of his failure. He should not be permitted to favor some over others when he and they contemplate the imminence of his failure."

■ Upon the facts of this case appellants would clearly appear to be cash customers under the section. They were "entitled to immediate possession" of their shares without further consideration. The trustee contends, however, that they are not entitled to reclaim under the section since they were not able "to identify specifically their property" for the reason that their shares were in the street name of the bankrupt.

It is clear, however, that the shares were taken in street name only for purposes of ultimate registration in the names of appellants and as a step in the routine process of purchase. The broker was not authorized, merely because these securities were in street name, to exercise "wide powers" over them. They were not commingled with the shares of

other customers and at all times, while in the possession of the bankrupt, the certificates were susceptible of being specifically identified as representing the shares to which appellants were entitled to correct the mistaken sale. There are no other claims to shares in these companies.

The trustee further contends that the shares were not subject to specific identification under paragraph (4) of the section since the certificates did not remain in their identical form in the bankrupt's possession until the date of bankruptcy.

The trustee here confuses the certificates appellants seek to reclaim with the ancestors of those certificates—the certificates originally surrendered by appellants. The holdings of appellants have indeed undergone change. They were sold and were reacquired. It is, however, the reacquired shares which appellants seek to reclaim and those shares had undergone no change in form during the period of the bankrupt's possession.[2]

Finally the trustee contends that reclaiming of these shares would constitute a preference under paragraph (5) of § 60, sub. e.[3] She asserts that the shares were reacquired for appellants from funds that would, but for their use, have been a part of the single and separate fund and that these shares should, therefore, form a part of that fund.

This result follows, however, only if use of the funds for purchase of the shares was "voidable or void under the provisions of this title."

█ Paragraph (5) thus incorporates as to property held for customers by a stockbroker bankrupt (and which would, but for the transfer, have constituted a part of the special fund) the concept of voidable preference as applied generally by § 60, sub. a(1) to property of any

bankrupt which would, but for transfer, have constituted part of his estate. To render a transfer of such property voidable as a preference it must have resulted in a diminution or depletion of the bankrupt's estate. 3 Collier, Bankruptcy § 60.20 (1967). Thus the check of a purchaser of goods who subsequently becomes bankrupt, intended as cash payment, is not rendered a preference, even though cashed some days after delivery of the goods, simply because it was paid from funds which would otherwise have formed a part of the bankrupt's estate. Engstrom v. Wiley, 191 F.2d 684 (9th Cir. 1951). The estate, enjoying that which was purchased, has suffered no depletion; nor has credit been extended by the holder of the check.

█ This element of depletion is wholly lacking here. The fund used for the purchase of the claimed shares was appellants' money, held for them by the bankrupt, for which they had given full consideration and to which they were entitled to immediate possession.

The steps here involved, although spread over several days, should be viewed realistically as in effect a single transaction, delayed only by the necessities of the peculiar purchase processes of the brokerage business. No extension of credit was involved. There was an exchange of property of equal value—securities for proceeds—by the bankrupt and appellants, its cash customers. That these proceeds were used shortly afterwards to merely reverse that exchange by purchase of replacement shares, rather than being sent directly to appellants, should not vary the essential nature of this transaction. This was not a transfer of property of the bankrupt to a creditor for an antecedent debt, required to create a voidable preference under § 60,

2. Even a change from street name into appellants' names would not have constituted a significant change in form so as to defeat their right to reclaim. In re McMillan, Rapp & Co., 123 F.2d 428, 138 A.L.R. 765 (3d Cir. 1941); see Mac-Lachlan, Bankruptcy § 280, p. 324 (1956).

3. " *   *   * [A] transfer by a stock-broker of any property which, except for such transfer, would have been a part of [the single and separate fund] may be recovered by the trustee for the benefit of such fund, if such transfer is voidable or void under the provisions of this title *   *   *."

sub. a(1), but was rather a contemporaneous exchange of collateral of like value, involving no net transfer of property held by the bankrupt for customers.[4]

As to the $604.44 which the bankrupt was required to pay to reacquire the shares in addition to the funds obtained in the initial sale, whether or not a preference resulted will require further fact finding by the District Court.[5] Subject to this question we conclude that appellants were entitled to reclaim the shares in question and that it was error to reject their claim for such relief.

## SCOPE OF APPELLANTS' RECOVERY

Appellants seek return to them of the 107 shares of Union Oil stock and the 25 shares of Amerada Petroleum stock, together with all cumulated stock and cash dividends.

In February, 1963, following the Referee's order in this matter in favor of the trustee, the stock was sold by the trustee and the sale approved by the Referee. Appellants had by then sought review of the Referee's order and they here contend that such review should be held to result in an automatic stay of the Referee's order, and that the trustee's sale in the face of review was without authority.

█ Such is not the law. Section 39, sub. c of the Act, 11 U.S.C. § 67(c), deals with the right to review of a referee's order. It provides in part:

"Upon application of any party in interest, the execution or enforcement of the order complained of may be suspended by the court upon such terms as will protect the rights of all parties in interest."

No application was made by appellants to suspend enforcement of the Referee's order. While that order did not direct sale but only permitted it, the trustee's obligation to handle the bankrupt's property to the best advantage of the creditors continued without abatement.

Appellants' recovery therefore should be determined by reference to the value of their shares as of the date of the sale by the trustee.

Reversed and remanded with instructions that the orders of the District Court and the Referee be vacated and for further proceedings looking toward the settlement of issues not reached by the Referee or the court, including those of preference and extent of recovery, interest and allocation of costs.

---

4. Legislative history can be found to support the contention that § 60, sub. e(5) was designed primarily to undo transfers to margin customers, not to undo contemporaneous transactions with cash customers of the bankrupt. See 3 Collier, Bankruptcy § 60.73, p. 1173, n. 19 (1967).

5. A preference here might well redound to the benefit of general creditors under § 60, sub. a(1) rather than to the special fund under § 60, sub. e(5), depending upon the source of these funds.