**SECURITIES AND EXCHANGE COMMISSION, Plaintiff,**

**Securities Investor Protection Corporation, Applicant,**

**v.**

**ALBERT & MAGUIRE SECURITIES CO., INC., et al., Defendants.**

**Civ. A. No. 72–2044.**

United States District Court,
E. D. Pennsylvania.
July 17, 1974.

Michael E. Don, Washington, D. C., Senior Staff Atty., for Securities Investor Protection Corp.

Donald M. Collins, Philadelphia, Pa., for respondent trustee.

R. Jere Bloche, Philadelphia, Pa. for the Chiampi's.

## MEMORANDUM OF DECISION

GORBEY, District Judge.

On December 7, 1972, the Honorable Emil F. Goldhaber, Bankruptcy Judge, after due notice and hearing, entered an order authorizing and directing the sale of certain securities which had been pledged by Albert & Maguire Securities Company, Inc. (hereafter referred to as Debtor) with the Stock Clearing Corporation of PBW Stock Exchange, Inc. (hereafter referred to as SCC) as collateral for a loan to the Debtor, and the use of the proceeds of such sale to pay the full amount of that loan and accrued interest thereon. This was done, and pursuant to court order, the excess proceeds have been segregated by the Trustee, pending the resolution of the issues raised by the Petition for Review now under consideration.

As indicated in Judge Goldhaber's certificate on the Petition for Review, dated February 9, 1973, the order sought to be reviewed was based on his conclusion that the securities which had been pledged by the Debtor were not "specifically identifiable property" within the meaning of the Securities Investor Protection Act of 1970 (hereafter referred to as 1970 Act), 15 U.S.C. § 78aaa, et seq. The Petition for Review is based on the theory that included in the securities used by the Debtor to collateralize the loan was the property of the Petitioners for Review, therefore they should have been permitted to pay off the loan and receive the securities, but inasmuch as the securities have been sold to satisfy the loan, they claim they are entitled to receive a portion of the excess proceeds segregated by the Trustee.

Two Petitions for Review have been filed, one of which has been settled. The second Petition for Review was filed on behalf of nine claimants, six of whose claims have also been settled,

the remaining three are Charles and Etta Chiampi and Xavier Chiampi. The Petition for Review is opposed by the Trustee respondent and by the Securities Investor Protection Corporation, each of whom has filed briefs.

As stated in the Trustee's brief, page 2, the gross value on the bankruptcy date of the account of Charles and Etta Chiampi was $292,477.86, subject to a debt owed the broker of $151,566.73, with a net value of $140,911.13. The gross value on the bankruptcy date of the account of Xavier Chiampi was $148,314.-28, subject to a debt owed the bankrupt Debtor of $54,744.59, with a net value of $93,569.67.

Only a small portion of the values represent cash accounts not relevant to the Petition for Review; all the rest related to margin accounts carried by the Debtor for the three petitioners.

On October 19, 1972, the date of the Trustee's appointment, pursuant to the 1970 Act, the Debtor owed the SCC approximately $950,000.00, which loan was collateralized by the pledge of securities by the Debtor, with the market value at that time of approximately $1,440,000.00.

The SCC issued a margin call on the loan immediately after the Trustee's appointment. The Trustee was without funds to pay the loan, but SCC was, by order of this court, prevented from foreclosing on such loan for a temporary period. SCC agreed with the Trustee not to attempt to foreclose such loan if the Trustee would seek authority from the Bankruptcy Court to sell out the collateral and pay off such loan, and the Trustee agreed that he would not ask an extension of this court's prohibition of foreclosure until the Bankruptcy Court could rule on his sale petition.

Such a petition was filed by the Trustee, and a hearing thereon was set by the Bankruptcy Judge for December 7, 1972. Adequate notice of such hearing was given to all customer creditors of the Debtor, and such hearing was held on the date set. At the hearing the Bankruptcy Judge issued an order authorizing and directing the Trustee to sell the collateral on pledge, and to pay with the proceeds thereof, the loan and accrued interest thereon. It is this order which is the subject of this Petition for Review. Brief of respondent Trustee, pages 3 and 4.

The legal issues presented here are governed by the 1970 Act, which created the Securities Investor Protection Corporation, of which § 60(e) of the Bankruptcy Act (11 U.S.C. § 96(e)) is its predecessor. These issues are:

1. Whether the petitioners have a legal right to reclaim any of the securities on pledge, or since the securities have been sold to satisfy the loan, whether they are entitled to receive a portion of the excess proceeds segregated by the Trustee.

This requires a determination of the subsidiary issues (a) whether the pledge of securities by the Debtor constituted a segregation in bulk; (b) whether the petitioners can seek reclamation although they owed Debtor substantial sums with respect to such securities.

2. Whether the relationship between Debtor and petitioners was a "contractual commitment" which was "outstanding" at the time of bankruptcy.

3. Whether the 1970 Act is constitutional under the Fifth Amendment, should the preceding questions be answered in the negative.

ISSUE 1. The pledge of the securities by the Debtor was not a segregation in bulk. Petitioners urge a contrary conclusion relying on § 6(c)(2)(C) of the 1970 Act, which states:

"The Trustee shall return specifically identifiable property to the customers of the debtor, entitled thereto . . . [if] such property was . . . on the filing date . . . segregated individually, or in bulk for customers collectively; . . . ."

Incorporated herein by reference is the historical background leading up to the 1970 Act as excellently presented in pages 4 to 11, inclusive, of the memorandum of the Securities Investor Pro-

tection Corporation in opposition to the Petition for Review of the Bankruptcy Judge's order of December 7, 1972.

As stated by the Trustee in his very thorough review of the law, at page 8: " 'Bulk Segregation' is a term of art." Section 78fff(c)(2)(C) requires that securities shall not be deemed specifically identified unless they remained in their identical form in the debtor's possession until the filing date, or unless, on that date they were "allocated to or physically set aside for" such customers. Securities will be deemed allocated to or physically set aside for customers if on the filing date they were segregated individually for a customer or segregated in bulk for customers collectively.

In the Trustee's brief at page 10, it is stated that all the securities in the SCC pledge were in the name of SCC and in its possession, except some which were further pledged by SCC to banks. This being so, it follows that the securities involved were not individually segregated and could not have been because they were not in *petitioners*' names nor otherwise identified as belonging to them.

Bulk segregation has been defined by the American Institute of Certified Public Accountants, Inc., as follows:

"Securities (usually constituting excess collateral in margin accounts) which are filed in alphabetical order in special boxes *in the vault,* but which are not specifically identified with the owners. Collateral records are maintained by the brokerage concern to indicate the owners and the securities are usually in the name of the brokerage concern."

*Audits of Brokers & Dealers in Securities* (1973) at page 195. Securities Investor Protection Corporation memorandum, page 16.

[Emphasis added]

Also, "Rule 402 of the Rules of the New York Stock Exchange, Inc. and Article III, § 19 of the Rules of Fair Practice of the National Association of Security Dealers, Inc. discuss segregation of customers' securities in terms which clearly contemplate that such securities will remain in the possession or under the control of the brokerage firm." Securities Investor Protection Corporation memorandum, page 16.

Thus, "bulk segregation" in view of the history of the Act pertains to securities which have been received or acquired for the accounts of customers who have an immediate right to receive such securities from the broker. Thus, securities for which the broker paid a portion of the purchase price or has lent cash or securities to a customer are not commonly regarded as entitling the customer to immediate possession and are, therefore, not required to be segregated, but may in accordance with usage and custom, be pledged by the Debtor. The securities in question were not fully paid for so petitioners were not entitled to immediate possession; they were not in the names of petitioners and were not specifically identifiable. Consequently, petitioner cannot reasonably expect to have the same right as so called "cash customers". Stock in pledge and in the name of SCC with no means of identification as to owners of specific shares of stock are not "specifically identifiable" under § 6(c)(2)(C).

Even if the securities could be specifically identified which they could not be, petitioners are not customers entitled to immediate possession of the securities. Section 6(c)(2)(B) of the 1970 Act provides in part:

*"All property* at any time received, acquired, or held by or for the account of a debtor from or for the account of customers *except cash customers* who are able to identify specifically their property in the manner prescribed in subparagraph (C), and the proceeds of all customers' property transferred by the debtor, including property unlawfully converted, shall constitute a single and separate fund; and *all customers* except such cash customers shall constitute a single and separate

class of creditors entitled to share ratably in such fund . . . "

[Emphasis added]

This question has been judicially determined in cases which involved § 60, sub. e of the Bankruptcy Act and would require the same result under the 1970 Act since a difference of the language of the two sections is not materially different. "All margin customers of a stock broker [are placed] in a single and separate class whose participation in the distribution of a stockholder's estate in bankruptcy is limited to the single and separate fund . . ." In re McMillan, Rapp & Co., 123 F.2d 428, 431 (3d Cir. 1941). In accord are: Mardick v. Stover, 392 F.2d 561 (9th Cir. 1968); Tepper v. Chichester, 285 F.2d 309 (9th Cir. 1960).

■ As to petitioners' claim that they should have been allowed to pay off their debt balances and then receive their securities (which have previously been shown not to be "specifically identifiable"), it can only be said that such a solution is not permissible under the 1970 Act and with special reference to § 78fff (c)(2)(A)(iv), which defines the "net equity of a customer" in a bankruptcy situation. It is in substance the total value of cash and securities owed to him by the debtor on the filing date, less the total value of cash and securities which he owes to the debtor on that date. The purpose and effect of the statute is, with respect to pledged stock that the amount of the debt balance be subtracted from the value of securities owed to a customer, who is then entitled to the difference.

ISSUE 2. The relationship between petitioners and the bankrupt Debtor is not a "contractual commitment", which was outstanding at the time of the bankruptcy within the meaning of § 78fff (d) of the 1970 Act. That section states:

"The trustee shall complete those contractual commitments of the debtor relating to transactions in securities which were made in the ordinary course of debtor's business and which were outstanding on the filing date . . ."

Petitioners assert that the Trustee is obliged to complete their margin accounts by allowing them to pay off the margin loan and to return to them the securities. Since the securities have been sold, the contention should be that the petitioners would be entitled to the sales price, dividends, plus interest thereon.

■ Although the petitioners as to margin accounts bear a contractual relation to the broker, the "contractual commitment of the debtor" within the meaning of the 1970 Act and its history as indicated clearly in the memorandum of the Securities Investor Protection Corporation does not refer to the relationship with a margin customer; it refers to the relationship of the debtor [broker] and another broker dealer."

In Securities and Exchange Commission v. Aberdeen Securities Co., Inc., 480 F.2d 1121 at 1125 (3d Cir. 1973) the Court of Appeals agreed with the district court's conclusion that:

"Undertakings involving only the debtor and his customer are not the contractual commitments contemplated by subsection (d) . . ." that "the open contractual commitments covered by [section 78fff(d)] are those between the debtor and another broker-dealer."

The brief of the Trustee at page 14 gives an adequate explanation of the meaning of the "domino effect" which § 6(d) was designed to avoid, and supports the conclusion already reached that the relevant section of the 1970 Act does not apply to either cash or margin accounts between a broker and his customer.

ISSUE 3. The 1970 Act is not unconstitutional under the Fifth Amendment of the United States Constitution, being supported as it is by both the bankruptcy provision in the United States Constitution and also by the commerce clause. The 1970 Act is an amendment to the Securities and Exchange Act of 1934.

Consequently, the power of Congress to modify substantial rights rests upon a broad and substantial base.

The situation with respect to margin account customers is well summarized in the Trustee's brief at pages 26 to 34. It is apparent, therefore, that the purpose of Congress with respect to the sections of the 1970 Act here involved was to eliminate the inequities which had arisen in connection with the bankruptcy of stock brokers.

■■ It is much too late to argue that the provisions of the federal Bankruptcy Act are subordinate to state laws with which they are in conflict. The Fifth Amendment as respects federal activity does not prohibit governmental regulation for the public welfare. The guarantee of due process requires only that the law shall not be unreasonable, arbitrary or capricious, and that the means selected shall have a real and substantial relation to the object sought to be attained. Nebbia v. People of State of New York, 291 U.S. 502 at 525, 54 S.Ct. 505, 78 L.Ed. 940 (1934).

■ Consequently, under its bankruptcy power, Congress may so legislate as to affect, modify or perhaps destroy vested rights. The test is whether the Congressional solution is so "grossly arbitrary and unreasonable as to be incompatible with fundamental law". Campbell v. Allegheny Corp., 75 F.2d 947 (4th Cir. 1935). Of course, if such legislation is to have retroactive effect, due process may be lacking.

In Louisville Joint Stock Land Bank v. Radford, 295 U.S. 555, 55 S.Ct. 854, 79 L.Ed. 1593 (1935), an amendment to the Bankruptcy Act applied only to mortgage debts existing upon its effective date, and not to those created after its effective date. It was held that the application of the statute to existing debts resulted in the taking of property without due process of law. The court stated:

"The power over property pledged as security *after* the date of the act may be greater than over property pledged before; *and this act* deals only with pre-existing mortgages. Because the act is retroactive in terms and as here applied purports to take away rights of the mortgagee in specific property, [the Fifth Amendment] of the Constitution is controlling."

*Supra* at page 589, 55 S.Ct. at page 863.

[Emphasis added]

Two years later in Wright v. Vinton Branch of Mountain Trust Bank, 300 U.S. 440, 57 S.Ct. 556, 81 L.Ed. 736 (1937), an amended statute not materially different from that involved in the Louisville Joint Stock Land Bank case, except that it did not apply retroactively, was before the court. The court held that the modification of substantive rights that would result from its application did not violate the Fifth Amendment.

The effective date of the 1970 Act was December 30, 1970, and it was not by its terms to have retroactive effect. As applied to petitioners, it must be noted that their margin accounts with Debtor were not opened until the early part of 1972.

As pointed out by the Trustee at page 21 of his brief in opposition to the Petition for Review:

"Petitioners were not casual dabblers in the stock market. The size of their accounts and of their indebtedness to the Debtor makes clear that they were people of substantial affairs well able to afford advisors, legal and otherwise. Accounts of such size are not generated immediately but testify to substantial experience in the securities market. Most importantly, these petitioners constantly chose to expand their chances for profit by trading the modest but secure status of a cash account customer for the complexities and risk of a margin account customer."

This court agrees with his conclusion that "They must be held to have a knowledge of the 1970 Act and to have pro-

ceeded with their activities with the assumption of all the risks provided for therein with respect to margin account holders."

■ But whether they did or did not have knowledge of the 1970 Act is not significant because the efficacy of a statute such as this does not depend upon a knowledge of its existence by those to whom it would apply. Any language conveying a different impression in the case of Tepper v. Chichester, *supra*, should be interpreted in the light of the facts of that case, as indicating that the statute involved was not to have retroactive effect and therefore would not be governed by Louisville Joint Stock Land Bank v. Radford, *supra*, but rather by Wright v. Vinton Branch of Mountain Trust Bank, *supra*.

Attention will now be turned to the rights granted margin customers such as the petitioners, and it will be found that such under the 1970 Act are not inconsiderable.

Although § 78fff(c)(2)(B) of the 1970 Act cuts off the right to reclaim once stock has been pledged, the

"Petitioners will each receive $50,000 in cash from SIPC through the Trustee, together with their proportionate share in the Fund to the extent the net value of their margin and cash accounts on the bankruptcy date exceeds such payments of $50,000. Such Fund includes all property in the hands of the Debtor on the filing date, that was traceable to all of its customers (except such property which was reclaimable by cash customers) and there are no claimants to such funds except customers of the Debtor (including those standing in the position of customers and excluding cash customers with respect to reclamation claims). These petitioners are thus afforded a substantial payment for their claims against the Debtor by way of the SIPC guarantee and the priority claim over all non-customer creditors to a Fund which embraces most of the assets in the hands of the

Trustee, including the portion of the proceeds of sale of the pledged stock which was returned to the Trustee." Trustee's brief, pages 33 and 34.

■ The Congressional purpose as to the 1970 Act was primarily to protect the rights of customers against the inequities which had been shown to exist. The Act meets the guarantee of due process under the Fifth Amendment since it is not "unreasonable, arbitrary, or capricious and the means selected [has] a real and substantial relation to the object sought to be attained." Nebbia v. People of State of New York, *supra*. It follows therefore that the Petition for Review must be dismissed.