In re Ronnie and Sherry PURDY, Debtors.

The NATIONAL CITY BANK OF ROME, Appellant,

v.

Ronnie PURDY and Sherry Purdy, Appellees,

Donald C. Vanlandingham, Trustee/Intervenor.

Civ. A. No. C81–157R.

United States District Court,
N. D. Georgia,
Rome Division.

Dec. 3, 1981.

Clinton J. Morgan, William W. Byington, Jr., Wright, Morgan & Jones, Rome, Ga., for appellant.

R. Everett Anderson, Anderson & Anderson Rome, Ga., for appellees.

Harry W. Pettigrew, Atlanta, Ga., for trustee Vanlandingham.

## ORDER

HAROLD L. MURPHY, District Judge.

Appellant National City Bank of Rome (hereinafter NCB) appeals from an order of the Bankruptcy Court, 10 B.R. 902, overruling NCB's objections to the confirmation of the debtors' Chapter 13 plan (11 U.S.C. § 1321), and confirming the plan. NCB contends that there are numerous defects in the plan as proposed and confirmed which require denial of confirmation.

## FACTS

The debtors filed a voluntary joint petition on December 5, 1980, seeking relief under Chapter 13 of the Bankruptcy Code, 11 U.S.C. § 1301 et seq. The Chapter 13 plan, filed concurrently with the petition, provided for payments to the trustee of $14.00 per week[1] and for priority payments pursuant to 11 U.S.C. § 507. The plan also contained the following provisions:

2(b) After the above payments, dividends to secured creditors whose claims are duly proved and allowed as follows:

National City Bank, 501 Broad Street, Rome, Ga. 30161

Quarles Furniture, 119 Broad Street, Rome, Ga. 30161

Secured Creditors Are To Be Paid 100%

* * * * * * * * * * * * * * * * * * * *

THIS IS A FOUR YEAR PLAN

* * * * * * * * * * * * * * * * * * * *

In addition, eight executory contracts of the debtors were listed as rejected. The plan proposed to pay nothing to unsecured creditors.

It further appears from the record that the debtors, Ronnie and Sherry Purdy, are employed as a carpenter and a seamstress, respectively; that their average monthly income is $995.75; that their monthly expenses are $928.33; that payments under the plan amount to $60.66 per month, leaving an excess of $6.76 per month. Attorneys' fees are $400.00.

Notice was given to the creditors through a printed form entitled "Order of Meeting of Creditors, Combined with Notice Thereof and of Automatic Stays," dated December 29, 1980. This document gave notice of the dates of the creditors' meeting and the hearing on the confirmation of the plan. It further provided that the plan was a four year plan, that zero percent was to be paid to unsecured creditors, and that the trustee would receive $14.00 weekly. Total indebtedness of the Purdys', categorized both as to overall secured and unsecured debts, was listed. Accompanying this notice was the "Proof of Claim: Acceptance or Rejection of Plan" form, which as to NCB, listed NCB's claim as secured.

NCB is owed $1,746.22, secured by a 1976 Ford Mustang automobile valued at $2,275.00. Hence, NCB is fully secured.

NCB rejected the proposed plan, under which it receives $49.00 per month plus interest over four years, and objected to confirmation of the plan. The plan was

1. The plan was subsequently amended to provide weekly payments to the trustee of $15.00.

confirmed by the Bankruptcy Court by order dated May 12, 1981.

## DISCUSSION

### I *Adequate plan and notice thereof*

Appellant complains that the plan as initially proposed and the notice which it received for the first creditors' meeting were inadequate.

NCB contends that the notice was legally insufficient in that it failed to contain a copy or summary of the proposed plan. Hence, NCB argues that it was required to accept or reject a plan before it had knowledge of its relevant contents such as the identity of secured creditors and the amount they were to be paid under the plan. It additionally asserts that, even if a copy or summary of the plan had been sent with the notice, it would have been insufficient because it did not "specif[y] the amount to be paid to each creditor, or the manner of payment, or whether and how interest has been computed. (In the case at bar, the Judge has in effect prepared a plan rather than confirmed a plan of the Debtors.)" Brief of Appellant at 4.

The Bankruptcy Court found no merit in NCB's claim that the plan filed was an insufficient Chapter 13 plan. The Court further ruled that most of the pertinent provisions of the plan were summarized in the notice of the first creditors' meeting. While the Court noted that the notice would have been more useful if NCB was notified that the plan proposed to pay its claim in full, it concluded that the secured creditors were being advised through the notice that their claims were being dealt with in a Chapter 13 plan.

"Being so advised, the creditors were put on notice to come into the Court to protect their interests ... [T]he rights of the creditors were not prejudiced by the failure of the summary to describe every major provision in the plan ...." *In re Purdy*, 10 B.R. 902, 905 (Bkrtcy.N.D.Ga. 1981).

The trustee argues that the plan filed met the mandatory requirements of the Code and the bankruptcy rules and forms. Requiring further detail, it is contended, would make Chapter 13 unworkable, because at the time the plan is filed, precise information is generally not available. Moreover, the trustee argues that the information on the notice form was sufficient to advise NCB to examine its own records to determine debtors' indebtedness to it. Additionally, it is contended that, since the notice informed NCB that its claim was scheduled as secured, NCB knew or should have known that it would be paid under Chapter 13, to the extent of the value of its security. In this case, NCB is "over-secured."

### A. *Sufficiency of plan as proposed*

To discover the requirements of a Chapter 13 plan, this Court must look to the statutes and legislative history.

Section 1321 of 11 U.S.C. provides that only the debtor shall file a plan. That plan must contain certain information under 11 U.S.C. § 1322. It must provide for payment of future income or earnings of the debtor to the supervision and control of the trustee, § 1322(a)(1), and provide for full payment of all claims entitled to priority under § 507. § 1322(a)(2). Finally, if the plan classifies claims, it must provide the same treatment for each claim within a particular class. § 1322(a)(3).

The foregoing represents the only mandatory provisions of a Chapter 13 plan. Subsection (b) of the statutory provision lists ten subsections that *may* be included in the plan. § 1322(b)(1) through (10). Thus, there is no defect in a plan which fails to state the periodic dollar amount to be paid to secured creditors.

This conclusion follows from the legislative history.

Chapter 13 is designed to serve as a flexible vehicle for the repayment of part or all of the allowed claims of the debtor. *Section 1322 emphasizes that purpose by fixing a minimum of mandatory plan provisions.* S.Rep.No. 95–989, 95th Cong., 2nd Sess. 141, *reprinted in* [1978] *U.S.*

*Code Cong. & Ad. News* 5787, 5927. [emphasis supplied]

The House Report reflects a similar intent.

> The bill permits great flexibility in the formulation of the plan. The only requirements are that the debtor pay all priority claims (mainly administrative expenses and certain taxes) in full, and submit such portion of his future earnings to the supervision of the court as is necessary for the execution of the plan. H.R.Rep.No. 95–595, 95th Cong., 1st Sess. 123, (1977) *reprinted in* [1978] *U.S. Code Cong. & Ad. News* 5963, 6084. (footnotes omitted).

While NCB's contentions on this point are rejected, debtors and their attorneys should strive to formulate plans, with the aid and advice of the trustee, that represent a careful and considered effort at repayment of indebtedness. The preparation of more detailed plans, when the data necessary for such a plan is on hand at an early date, would go far in aiding the efficient administration of bankruptcy proceedings in this Division. However, the Court realizes that, in most cases, the payment levels to individual creditors, as opposed to a class of creditors, are unknown at least until the conclusion of the first meeting of creditors.

### B. *Adequacy of Notice*

This contention of NCB is governed by certain sections of the Rules of Bankruptcy Procedure, 11 U.S.C. Those rules provide that a debtor may file a plan with his petition or within ten days thereafter. Rules Bankr.Proc. Rule 13–201(a). Subdivision (b) allows the Bankruptcy Court to order the debtor to provide sufficient copies of the plan to permit attachment of a copy to each notice of the creditors' meeting. Rules Bankr.Proc. Rule 13–201(b). Rule 13–202(a) specifies the procedure by which a creditor may accept or reject a Chapter 13 plan. Finally, Rule 13–204(a)(1) concerns the procedures for calling a creditors meeting. That rule provides that

> [a] copy or a summary of the last filed plan and a form of proof of claim containing provision for acceptance or rejection of the plan shall accompany the notice of the meeting.

The Bankruptcy Court found that most of the pertinent provisions of the plan were summarized in the notice for the first meeting of creditors, and this Court agrees with that conclusion. In light of this Court's discussion in Part IA of this order, it would be illogical to require a debtor to attach a summary of the proposed plan containing more detail than that required of the plan itself. Certainly it would be more beneficial to creditors if a copy of the plan accompanied notice of the first meeting of creditors, but the rules do not demand such a result. Rather, whether to require such attachment is within the discretion of the Bankruptcy Court. Rules Bankr.Proc. Rule 13–201(b). This Court pretends no detailed knowledge of the exigencies related to the technical administration of Chapter 13, and thus will not substitute its own judgment in place of the studied discretion of the Bankruptcy Court. In this instance, not requiring the attachment of the whole plan was not an abuse of discretion.

Moreover, NCB is adequately protected by the rules in situations where it considers itself inadequately informed of the specifics of the plan. First, it should be noted that NCB immediately rejected the proposed plan, thus suffering no prejudice from the plan's lack of terms. But more importantly, had NCB accepted the plan before full knowledge of its contents, the rules allow a creditor to withdraw or change its acceptance or rejection before the Bankruptcy Court confirms or modifies the plan. Rules Bankr.Proc. Rule 13–202(a). If, after the exercise of due diligence, a creditor should find itself initially misled as to the proposed plan, cause exists for a withdrawal of its initial acceptance.

### II *Entitlement to Contractual Monthly Payments*

NCB next contends that the proposal for payments under the plan of $49.00 plus

interest per month, as opposed to $113.00 per month as set in NCB's initial contract with the debtors, is violative of its constitutional rights. NCB argues that since its conditional sales contract predates the effective date of the Bankruptcy Reform Act, the plan as confirmed violates the obligation of contract. Furthermore, NCB argues that the payment schedule under the plan is so grossly unreasonable as to constitute an impairment of the obligation of contract and a violation of due process of law.

As to NCB's first contention, it is argued that the Code cannot be retroactively applied to security interests created before the effective date of the Reform Act. The Constitution provides that "Congress shall have Power ... To establish ... uniform Laws on the subject of Bankruptcies throughout the United States." U.S.Const. art. I, § 8. Pursuant to that power, Congress passed the Bankruptcy Reform Act of 1978, Pub.L.No.95–598, on October 6, 1978. The President signed the act into law on November 6, 1978. NCB's conditional sales contract with the debtors is dated March 16, 1979. The Reform Act took effect on October 1, 1979.

■ As of October 1, 1979, the old Bankruptcy Act stood repealed, except for those cases pending as of that date. To accept NCB's argument would be to conclude that Congress intended a "gap" in the bankruptcy laws so that no law governs the present issue. Because the Court considers such a conclusion inconsistent with the broad congressional power in the bankruptcy area, which Congress has not hesitated to invoke, the Court concludes that Congress intended the substantive portions of the Reform Act to have retroactive effect. *See, Rodrock v. Security Industrial Bank,* 642 F.2d 1193, 1196–1197 (10th Cir. 1981).

■ The Bankruptcy Clause of the Constitution is not written as a guarantee to individuals that their rights will not be impaired by Congress, the states or private parties. *McLellan v. Mississippi Power and Light Co.,* 545 F.2d 919, 926 n.22 (5th Cir. 1977). This conclusion follows from the fact that Congress, unlike the States, is not

prohibited from impairing the obligation of contract. *Rodrock, supra* at 1197.

■ What Congress cannot do is invoke the bankruptcy power to violate the Fifth Amendment to the United States Constitution. The taking of substantive rights in specific property acquired prior to the enactment of bankruptcy litigation is unconstitutional. *Louisville Joint Stock Land Bank v. Radford,* 295 U.S. 555, 55 S.Ct. 854, 79 L.Ed. 1593 (1935).

■ The standard to be employed when inquiring into Congress' power in this regard was stated in *Kuehner v. Irving Trust Company,* 299 U.S. 445, 57 S.Ct. 298, 81 L.Ed. 340 (1936). The *Kuehner* Court held,

> While, therefore, the Fifth Amendment forbids the destruction of a contract it does not prohibit bankruptcy legislation affecting the creditor's remedy for its enforcement against the debtor's assets, or the measure of the creditor's participation therein, if the statutory provisions are consonant with a fair, reasonable, and equitable distribution of those assets.

299 U.S. at 452, 57 S.Ct. at 301.

Significantly, *Kuehner* involved the *contract right* of a landlord under a lease. The Court stated that, in respect to the operation of the bankruptcy power and laws, there is "a significant difference between a property interest and a contract, since the Constitution does not forbid impairment of the obligation of the latter." *Id.*

*Kuehner* therefore sets the standard of inquiry as whether the Code "modifies the secured creditor's rights, remedial or substantive, to such an extent as to deny the due process of law guaranteed by the Fifth Amendment." *Wright v. Vinton Branch of the Mountain Trust Bank of Roanoke,* 300 U.S. 440, 470, 57 S.Ct. 556, 565, 81 L.Ed. 736 (1937). In *Wright,* the Court upheld a law that postponed a mortgagee's right to foreclose on a mortgagor's property upon default. The *Wright* Court found that the law involved did not constitute a complete taking of the mortgagee's interest, but merely a postponement of the time at which the mortgagee could assert its rights.

NCB's contentions are controlled by the authorities cited above. The Bankruptcy Court's order confirming the Chapter 13 plan in no way impairs NCB's property interests. It does, however, foreclose NCB's ability to enforce its contractual rights against the debtors at this time. This is not an impairment of a contractual right within the meaning of the Constitution.

Neither does the confirmed plan violate due process. "The new Chapter 13 ... provide[s] a simple yet precise and effective system for individuals to pay debts under bankruptcy court protection and supervision." S.Rep.No. 95–989, 95th Cong., 2nd Sess. 13, *reprinted in* [1978] *U.S.Code Cong. & Ad.News* 5787, 5799. The bankruptcy scheme is rife with protections designed to allay the fears of creditors such as NCB that, sometime in the future, debtors in a Chapter 13 case will default on their duties under the plan.

For example, a creditor may request that adequate protection be provided through periodic cash payments by the trustee if the operation of the plan operates so as to decrease the value of the creditor's interest in the property, § 361(1); or through an additional or replacement lien to the extent of the decrease in value of the interest, § 361(2); or by granting other relief amounting to an entitlement of payments as an administrative expense priority, § 361(3).

NCB could also avail itself of the process afforded in the Code by seeking relief from the automatic stay, § 362(d)(1). Moreover, § 1325(a)(5)(B)(i) provides that the holder of a secured claim retain the lien securing such claim. This protects the secured claim holder pursuant to § 506(a), which limits the secured creditor to a secured claim only to the extent of the value of its security.

Under the Court's calculations, these provisions more than adequately protect NCB, for the total payments under the plan are in excess of the secured claim and even the present value of the security. As Judge Norton held in *Matter of Feimster*, 3 B.R. 11 (Bkrtcy.N.D.Ga.1979),

The retention of the lien and the payment provided by the debtor in his plan does provide "adequate protection of an interest in property of" this secured creditor. § 362(d)(1). The § 1325(a)(5)(B)(i) lien in property is equal to the amount of the secured claim, being the value of the property to be retained and used by the debtor, and the plan provides payments in excess of the secured claim.

3 B.R. at 15.

Finally, § 1329 was designed to meet NCB's trepidation by permitting modification of the confirmed plan after confirmation, but prior to completion of payments under the plan.

In short, NCB has not convinced the Court that the operation of the Code in this case is "unreasonable, arbitrary or capricious" or that the means selected do not "have a real and substantial relation to the object sought to be obtained" in order to be violative of the due process guarantee. *Securities and Exchange Commission v. Albert & Maguire Securities Company, Inc.*, 378 F.Supp. 906, 912 (E.D.Pa.1974), *citing Nebbia v. People of State of New York*, 291 U.S. 502, 525, 54 S.Ct. 505, 510, 78 L.Ed. 940 (1934).

### III  *Confirmation of the Plan*

NCB alleges a slew of deficiencies in the plan as confirmed. Appellant's first objections concern provisions contained in the Bankruptcy Court's order confirming the plan which do not appear in the plan itself. These include allowances for payment of interest on the debt and provision for retention of the lien on the secured claim as required by § 1325(a)(5)(B).

The Court agrees that absent these terms a plan is deficient but finds that the appellant has suffered no prejudice due to their omission. The Court examines the proceedings and record below in its entirety, not in a piecemeal fashion. In this regard, the plan, the order confirming the plan, the Bankruptcy Court's order of May 12, and the statute, when read together, constitute compliance with the relevant subsections of § 1325.

NCB's main objection to the confirmed plan concerns the amount of payments to unsecured creditors. A threshhold matter is the standing of NCB, a secured creditor, to object to the plan's provisions dealing with unsecured creditors. The Court holds that a secured creditor has standing to voice such objections.

Section 1324 provides that a "party in interest may object to the confirmation of the plan." While § 101 does not define "party in interest," the legislative history of § 1324 indicates that objection by one affected by the plan is the proper course in this instance, rather than "merely rejecting the plan." S.Rep.No. 95–989, 95th Cong., 2nd Sess. 142, *reprinted in* [1978] *U.S.Code Cong. & Ad.News* 5787, 5928.

In addition, NCB is affected by any order either confirming or rejecting the plan. Certainly, provision for payment of unsecured creditors under the plan affects the amount of money to be disbursed to NCB and possibly the duration of the plan.

Finally, this Court, as well as the Bankruptcy Court, has the obligation to supervise the administration of the bankruptcy laws. Confirmation of the plan does not end judicial supervision nor alleviate court protection of the debtor.

NCB contends that a Chapter 13 plan which pays nothing to unsecured creditors has not been proposed in "good faith" pursuant to § 1325(a)(3). This issue continues to be one of the most actively litigated issues of bankruptcy law, and the Court harbors no misconceptions that its own analysis will end the debate.

Section 1325 provides that:

(a) The court shall confirm a plan if—

(1) the plan complies with the provisions of this chapter and with other applicable provisions of this title;

(2) any fee, charge, or amount required under chapter 123 of title 28, or by the plan, to be paid before confirmation, has been paid;

(3) *the plan has been proposed in good faith and not by any means forbidden by law* ;

(4) *the value, as of the effective date of the plan, of property to be distributed under the plan on account of each allowed unsecured claim is not less than the amount that would be paid on such claim if the estate of the debtor were liquidated under chapter 7 of this title on such date* ;

(5) with respect to each allowed secured claim provided for by the plan—

(A) the holder of such claim has accepted the plan;

(B)(i) the plan provides that the holder of such claim retain the lien securing such claim; and

(ii) the value, as of the effective date of the plan, of property to be distributed under the plan on account of such claim is not less than the allowed amount of such claim; or

(C) the debtor surrenders the property securing such claim to such holder; and

(6) *the debtor will be able to make all payments under the plan and to comply with the plan.* (emphasis supplied)

The Bankruptcy Court rejected NCB's contention, finding no requirement under § 1325(a)(3) for payments into the plan greater than the amounts proposed:

... [T]his Court has rejected the notion that there is any payment requirement embodied in the term "good faith". *See In re Walsey,* 7 B.R. 779 (1980, Bkrtcy.N.D.Ga.) and *In re Carter,* 9 B.R. 140 (1981, Bkrtcy.N.D.Ga.). The only sections of Chapter 13 which qualify the payments to be made to creditors are 11 U.S.C. § 1325(a)(4) and (a)(5)(B)(ii) ... The debtors' plan meets these standards. As there are no other payment standards under Chapter 13 which the debtors are required to meet the Court concludes that NCB's objection is without merit.

At 906.

In *In re Carter, supra,* Bankruptcy Judge Robinson, while acknowledging authority which required "meaningful" payments to unsecured creditors under § 1325(a)(3), held that the imposition of additional criteria requiring "meaningful" payments would be an improper exercise in judicial legislating.

Litigation has generated two conflicting interpretations of the good faith requirement. Although the cases are too numerous to discuss individually, the rationale of each viewpoint can be gleaned from representative authorities.

A. *Authority for not requiring payments to unsecured creditors.*

1. In *In re Stollenwerck*, 8 B.R. 297, 7 B.C.D. 199 (M.D.Ala.1981), District Judge Hobbs affirmed confirmation of a plan providing no payments to unsecured creditors. The plan had proposed payments of $200.00 per month to secured creditors. The debtors had a $400 per month excess over their expenses and plan payments. One unsecured creditor with a claim of $4568.67 appealed the confirmation to the District Court.

The *Stollenwerck* Court was satisfied that § 1325(a)(4) was complied with, for had the debtors proceeded to liquidate under Chapter 7, 11 U.S.C., the creditors would not have been entitled to any money. Further, the court stated that whether payments are made to unsecured creditors was a decision better left to the bankruptcy judge. 8 B.R. 297, 7 BCD at 199.

Rejecting the claim that the legislative history revealed a congressional intent to require payments,[2] *Stollenwerck* thus followed the rationale of *In re Cloutier*, 3 B.R. 584, 587 (Bkrtcy.D.Colo.1980), which held that

[G]ood faith is lacking only in those unusual cases in which there has been an abuse of the provisions, purposes or spirit of Chapter 13.

8 B.R. 297, 7 BCD at 200. It was noted that the fact that a proposed plan offers no payment to unsecured creditors should be a strong factor pointing toward disapproval of the plan, but that a debtor who so proposes should not be conclusively barred from utilizing Chapter 13.

[T]here are several permissible reasons why a debtor may prefer a Chapter 13 plan to a discharge under Chapter 7. The debtor may desire to pay attorney's fees through the plan [§ 1322(a)(7) ], to cure a default on a home mortgage [§ 1322(b)(3) ], or to protect secured property in accordance with the approved chapter 13 plan [§ 1325(a)(5)(B) ].

2. *In re Barnes*, 7 BCD 961, BLD ¶ 67988 (D.D.C.1981) (Parker, J.) stands for the same general proposition. Barnes filed a Chapter 13 plan providing for payments of $91.00 monthly for three and one-half years, proposing 100% payment of her secured debts and 1% payment of unsecured debts. Her net monthly income was $749, with monthly expenses of $658. The bankruptcy court rejected the plan, holding that in light of § 1325(a)(3)'s good faith requirement of "meaningful" payments, the proposed 1% payment to unsecured creditors was unsatisfactory.

On appeal, the District Court reversed. The court noted that if the requirements of § 1325(a) are met, confirmation of the plan is mandatory, and that the purpose behind Chapter 13 is to give the debtor a fresh start. Conceding that support existed for the bankruptcy court's rationale, the court held,

However, nothing in the Bankruptcy Code suggests that "good faith" as used in Section 1325(a) was intended to depart from the term's traditional meaning of honesty in fact or honesty of intention. *See 5 Collier on Bankruptcy*, para. 1325.-01[2] at 1325–8 (15th ed. 1979). 7 BCD at 962; BLD ¶ 67988 at 78937.

The court viewed § 1325(a)(4), requiring that creditors receive at least as much in a Chapter 13 plan as they would have if the debtor liquidated under Chapter 7, as the only standard for evaluating sufficiency of repayment to unsecured creditors. "The

---

**2.** The court was evidently referring to the following passage:

In addition, an overly stringent and formalized chapter XIII (wage earner plans) has discouraged overextended debtors from attempting to arrange a repayment plan under which

all creditors are repaid most, if not all, of their claims over an extended period. The hearings before the Subcommittee indicated strongly that most consumer debtors would rather work out a repayment plan than file straight bankruptcy. H.R.Rep.No.95–515, *supra* at 117.

statute does not indicate that the repayment must provide a substantial benefit to creditors over a Chapter 7 liquidation; it 'requires only that creditors receive more than they would if the debtor went into straight bankruptcy'." 7 BCD at 962; *id.* (citations omitted).

*Barnes* also addressed the question of "judicial legislation" when it stated that,

It will bode ill for the Bankruptcy Courts to use the requirement of "good faith" as a peg from which they spin a web of nebulous judicial requirements for confirmation which have not been made by Congress. In an area fraught with enmity and misunderstanding as is created by discharge of debts in bankruptcy, this Court is reticent to tack onto the work of Congress its own notions of what debtors ought to do in order to be afforded discharge from these debts.

7 BCD at 962; *id.*

3. The Bankruptcy Courts of this District follow the rationale of *Stollenwerck* and *Barnes.*

This term "good faith" should be interpreted in the statutory sense rather than a lay conception of good faith which may vary from judge to judge ... [T]he term "good faith" as used by Congress in §§ 1325(2)(3) and 1129(a)(3) does not include as a part of its meaning a requirement to make a qualitative payment of any amount to unsecured creditors.

*In re Wiggles,* 7 B.R. 373, 6 BCD 1326, 1327 (Bkrtcy.N.D.Ga.1980).

B. *Authority Requiring Payments to Unsecured Creditors*

The clear majority of cases that have analyzed this issue have concluded that the "good faith" clause imposes minimum debt-repayment requirements as prerequisites to the confirmation of Chapter 13 plans.[3] The Court will discuss some representative cases in order to detail the underpinnings of this conclusion.

1. In *In re Heard,* 6 B.R. 876 (Bkrtcy.W. D.Ky.1980), a plan which proposed 1% payments to unsecured creditors was rejected as not proposed in good faith, being "basically an attempt to keep the car." 6 B.R. at 879.

Holding that "repayment is a *sine qua non* of a Chapter 13 plan," the court reasoned that "equating repayment of claims to the 'good faith' requirement ensures that the general creditors in a Chapter 13 plan will be fairly dealt with." 6 B.R. at 880.

The *Heard* court found support for its conclusion in the legislative history. Citing House Report No. 95–595, *supra,* the court stated that Chapter 13 gave new powers to debtors. A corollary of that new power was the debtors' "responsibility to deal with creditors honestly and fairly by repaying them a substantial portion of what they owed." 6 B.R. at 881.

The court then proceeded to define "good faith" as an inquiry whether there has been an abuse of the provisions, purpose, or spirit of Chapter 13 in the proposal or the plan, 10 *Collier on Bankruptcy* ¶ 29.06[6] at 339 (14th ed. 1978), and concluded that,

The "purpose" and "spirit" of Chapter 13, as gleaned from both the legislative history and from the broad discharge provisions of the Code, is to provide the debtor with an effective and court-protected method for the meaningful repayment of his debts. 6 B.R. at 880–81.

2. In *In re Iacovoni,* 2 B.R. 256 (Bkrtcy.D. Utah 1980) is perhaps the leading case on the meaningful payment requirement.[4] After concluding that a Chapter 13 plan requires provision for payment of debts in general, the court held that payments on unsecured claims as well are intended.

The statute is an effort to promote payments to unsecured creditors to the

---

3. *See,* Cyr, *The Chapter 13 "Good Faith" Tempest: An Analysis And Proposal For Change,* 55 Am.Bankr.L.J. 271 (1981), at 273 and n. 10.

4. *Iacovoni* was a consolidation of a number of Chapter 13 cases. Iacovoni himself had no secured debts, but over $17,000 unsecured debts. He proposed no payments at all under his plan. Since the other cases along with Iacovoni's are similar to the case at hand, we need not summarily dismiss *Iacovoni* as distinguishable upon its facts.

benefit of debtors and creditors alike. "Partial repayment" of unsecured debts under Chapter 13 is preferable to almost certain nonpayment of those debts in "straight bankruptcy" where "both the debtor and his creditors are the losers." H.R. Debates, 123 *Cong.Rec.* H11690–92, H11696–710 IV–12 (daily ed. Oct. 27, 1977). Chapter 13 succeeds if incentives to the debtor are adequate and demand for payments is not excessive ... Excessive demands for payment are prevented by eliminating the unsecured creditor's right to vote against the plan in exchange for the assurance, at 11 U.S.C. § 1325(a)(4), that the creditor will receive at least as much as would have been paid under Chapter 7. The creditor's right to vote on the plan is eliminated under these circumstances since, "if the debtor makes an effort to repay his creditors, the creditors should be able to say that the plan does not propose to pay enough or that it does not do other things that the creditors want." *Id.* at IV–12.

2 B.R. at 265.

The court then found that § 1325 required a "good faith" effort to make meaningful payments. The "good faith" standard must be read alongside of § 109(e)'s requirement that the debtor have a regular income, and in conjunction with § 1325(a)(4)'s "not less than the amount ... if the estate of the debtor were liquidated" standard. In this regard, the court interpreted the report of the Commission On the Bankruptcy Laws of the United States, H.R.Doc.No.93–137, 93rd Cong., 1st Sess., Pts. I and II 136 (1973), from which the Reform Act was derived, as signifying that "good faith" be given substance, so as to protect the rights of unsecured creditors.

Thus, the "good faith" requirement carries a substantive content which affects the effort and payments on unsecured claims required for confirmation of a plan independent of the "best interest of the creditors" test ... [T]he proponents of the Chapter 13 provisions intended and projected that a substantial amount would be paid out under all proposed plans ... [I]n reworking the Chapter 13 provisions, proponents were attempting to produce a medium of repayment of "most, if not all" of the claims against the debtor.

2 B.R. at 266.

3. Finally, in *In re Polak*, 9 B.R. 502 (W.D.Mich.1981), the District Court affirmed the rejection by the Bankruptcy Court of a plan which proposed 10% payment to unsecured creditors. "Implicit in [the cases requiring substantial or meaningful repayment to unsecured creditors] is the feeling that a debtor must deal honestly with his creditors and has to pay a price for the benefits of a Chapter 13 discharge." 9 B.R. at 506.

The Court examined the history of wage earner plans and the legislative history of § 1325 and found that Chapter XIII, the predecessor to the current law, had two purposes:

[T]o rehabilitate the debtor in mind, as well as in finances by providing a mechanism for the worker to pay off his debts.

9 B.R. at 509. However, under Chapter XIII, the debtor had to meet stringent financial qualifications, and his plan had to gain approval of all creditors affected.

Despite these restrictions, the literature suggests that many consumers wanted to pay off their obligations, and the Act encouraged the use of full payment plans.

*Id.*

After reviewing the legislative history of Chapter 13, the court rejected debtor's claim that § 1325(a)(4) provided the only quantitative standard of repayment.

While Chapter 13 is much more flexible and provides the debtor with increased protections, there is nothing in the committee reports suggesting Congress turned away from one of its primary objectives in Chapter XIII, that is, encouraging a debtor to repay his debts.

*id.*

There can be no initial disagreement that § 1325 is ambiguous; the term "good faith" is not particularly amenable to exact definition. In such circumstances the

Court must refer to the legislative history. *Cf., Keuhner v. Irving Trust Co., supra* 229 U.S. at 449, 57 S.Ct. at 300 ("The legislative history of this provision ... cannot affect its interpretation, since the language of the act as adopted is clear.")

Then again, the Court is mindful of the conflicting interpretations given the legislative history itself, as evidenced by the cases referred to above. One authority has stated that the legislative history is not definitive on this issue.

> There is no reported case law construing the good-faith requirement under Bankruptcy Act § 651, nor does the legislative history of section § 1325(a)(3) reveal its rationale. 5 *Collier on Bankruptcy,* ¶ 1325.01[c] at 1325–8 (footnotes omitted).

However, the Court is equally mindful on the instructions from Justice Frankfurter in gearing up for its task.

> The intrinsic difficulties of language and the emergence after enactment of situations not anticipated by the most gifted legislative imagination, reveal doubts and ambiguities in statutes that *compel* judicial construction. Frankfurter, *Some Reflections on the Reading of Statutes,* 47 Colum.L.Rev. No. 4 at 529 (1947) (emphasis supplied).

■ The Court has studied the lengthy legislative history of the Bankruptcy Code and finds no support for the proposition that § 1325(a)(3)'s "good faith" requirement actually means "meaningful" payments to unsecured creditors under a Chapter 13 plan. Rather, the Court holds that Chapter 13 was enacted because the wage earner plan scheme of Chapter XIII did not represent a realistic alternative to straight bankruptcy or liquidation.

> ... [A]n overly stringent and formalized chapter XIII (wage earner plans) has discouraged overextended debtors from attempting to arrange a payment plan under which all creditors are repaid most, if not all, of their claims over an extended period. The hearings before the Subcommittee indicate strongly that most consumer debtors would rather work out a repayment plan than file straight bankruptcy. *They opt for straight bankruptcy only because present chapter XIII simply cannot meet their needs.*

H.Rep.No.95–595, 95th Cong., 1st Sess. 117 (1977), *reprinted in* [1978] *U.S.Code Cong. & Ad.News* 5963, 6077–6078.

■ Moreover, while the Court has found many references to "payment" or "repayment" in the legislative history, none were directed specifically to unsecured creditors. Instead, payment represents an alternative to creditors receiving satisfaction of their claims through liquidation. We are reminded once again of Justice Frankfurter's "threefold imperative" of statutory construction:" (1) Read the statute; (2) read the statute; (3) read the statute!" H. Friendly, Benchmarks, 202 (1967), *See Hospital Authority of Floyd County, Ga. v. Schweiker,* 522 F.Supp. 569, 574 (N.D. Ga.1981). In this regard, only § 1325(a)(4) sets forth any provision in a Chapter 13 plan dealing with unsecured creditors. As the Bankruptcy Court found that unsecured creditors would receive nothing in the event of liquidation, there is compliance with this section.

This interpretation is confirmed by the legislative history.

> The court is required to confirm the plan if six requirements are met. The plan must comply with the provisions of chapter 13 and with other applicable provisions of the bankruptcy code. Fees and charges required under chapter 123 of title 28 to be paid before confirmation must have been paid. The plan must have been proposed in good faith, and not by any means forbidden by law. *The plan must meet the best interest of creditors test with respect to unsecured claims—the value, as of the effective date of the plan, of property to be distributed under the plan on account of each unsecured claim must be not less than the amount that would have been paid on that claim if the estate of the debtor were liquidated under chapter 7 of the effective date of the plan.* With respect to secured claims provided for by the plan, the holder of the claim must have

accepted the plan, or the debtor must either distribute under the plan the value, as of the effective date of the plan, to the holder of the claim, property of a value that is not less than the allowed amount of the secured claim, as determined under proposed 11 U.S.C. 506(a), or the debtor must surrender the property securing the claim to the holder of the claim. Finally, the debtor must be able to make all payment under the plan and to comply with it.

H.Rep.No.95–595, *supra* at 6385. (emphasis supplied).

Desirable as it may be to have unsecured creditors receive payments under a Chapter 13 plan, the statute does not require it. The Court concurs with those cases that find no proof that "good faith" in § 1325(a)(3) was meant to require anything other than its traditional meaning of honesty in fact or intent. *In re Cloutier, supra,* at 587.

However, this analysis should not indicate that this result is appropriate in all cases. There are circumstances where the future income of the debtor and the amount of unsecured claims would warrant payments to unsecured creditors, and failure to do so would be an abuse of the spirit and purpose of Chapter 13. This is not such a case, nor need the Court sketch the parameters of "good faith" in this order.

Finally, the Court concludes that to impose a payment requirement under § 1325(a)(3), as some courts have done, engrafts upon that section a personal interpretation of what the bankruptcy laws *should* provide, rather than what Congress enacted. While courts often must interpret an ambiguous statute so that its effect is consistent with the legislature's intent, construing the statute in this case to demand minimum amounts of payments to unsecured creditors would improperly enter the field of legislating which is better left to the other branches of government.

### IV *Four year plan*

- NCB argues that the Bankruptcy Court improperly confirmed a four year plan without the requisite showing that the plan could not succeed as a three year plan.

■ The Bankruptcy Court, for cause, may approve a plan which provides a period of payments longer than three years. § 1322(c). Here, the Court found that the debtors were paying into the plan as much as possible, especially in light of increased medical expenses for Mrs. Purdy. This Court holds that such a finding constitutes cause to extend the plan beyond three years.

### V *Attorney's and trustee's fees*

NCB's final argument is that the Bankruptcy Court improperly constructed a fee payment schedule for the trustee and debtor's attorney. The Bankruptcy Court ordered that from the money paid into the plan by the debtors, the trustee shall first pay any unpaid claim of the kind specified in § 507(a)(1) and the percentage fee for the standing trustee under § 1326(a)(1) and (2). "When these claims have been paid in full the trustee shall pay any other claims having priority under 11 U.S.C. § 507." At 907.

■ The Court construes the order in light of § 1326. That section provides, in relevant part, that,

(a) Before or at the time of each payment to creditors under the plan, there shall be paid—

(1) Any unpaid claim of the kind specified in section 507(a)(1) of this title; and

(2) if a standing trustee appointed under section 1302(d) is serving in the case, the percentage fee fixed for such standing trustee under section 1302(e) of this title.

The Court holds that section (a) requires *accrued* costs of administration and filing fees, as well as fees due the Chapter 13 trustee, to be *disbursed* before payments to creditors under the plan. S.Rep.No.95–989, *supra,* at 5928.

Thus, while the fees may be collected "up front" (to use the terminology of the trus-

tee), they may not be disbursed until such time as they accrue. §§ 1302(e), 330(a)(1). In any event, the procedure employed here is not grounds for reversing the confirmation of the plan.

ACCORDINGLY, finding no merit in any other contention of NCB, the confirmation of debtors' Chapter 13 plan is AFFIRMED.